**J. J. LYNN,**

v.

**E. A. MAAG et al.**

No. 15138.

United States Court of Appeals,
Fifth Circuit.

March 30, 1955.

Rehearing Denied May 9, 1955.

Otis E. Nelson, Jr., Otis E. Nelson, Nelson, Montgomery, Robertson & Sellers, Wichita Falls, Tex., for appellant.

Jack G. Banner, Philip S. Kouri, Kouri & Banner, Wichita Falls, Tex., for appellees.

Before BORAH and TUTTLE, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

Appellees owned an 80-acre tract of land and had a grass lease on an adjoining 450-acre tract. They pastured cattle on the land and maintained on their own tract a large surface watering tank. In 1948 they granted an oil and gas lease on the 80-acre tract to appellant for a primary term of three years; and in July, 1951, appellant entered into a contract with Hayden Farmer Drilling Company (called Farmer) whereby the latter would drill a test well for stated compensation.

Drilling operations began immediately, the well being located 75 to 100 yards from appellees' watering tank and in the line of natural drainage toward the tank. In the course of drilling operations, as is customary, Farmer dug three pits into which drilling mud was put for various uses in the drilling. On August 27, 1951, it was determined that the well was a dry hole and it was plugged, Farmer moving his equipment off the location two days later. The mineral lease expired by its terms on September 2, 1951. Appellant subsequently employed another company to fill or "cover" the pits; and it appears that the two smaller pits were completely filled by November, 1951, and the larger by August, 1952.

In August, 1953, appellees brought this suit in State Court, alleging: that in late 1951 some of the cattle began to appear sickly, and their condition deteriorated with the passage of time; that veterinarians were unable to diagnose the sickness which continued and spread; that several cattle died early in 1953 and others became progressively more debilitated; that a veterinarian eventually diagnosed the illness as "dental fluorisis", a condition caused by excessive consumption of fluorides which brings about "a change in the cattle's teeth, to

the extent that the animal's ability to chew is so impaired that there is a serious interference with grazing, cud chewing, and resulting in a poor digestion"; that the pits left by appellant had occasionally overflowed and the water therefrom had drained into the watering tank; that they had eventually learned the slush pits and watering tank contained fluorides in contaminating quantities. They charged appellant with negligence in failing to erect adequate fences around the pits and to cover them after abandoning the lease. They sought $13,761.65 in damages for the death, sickness and depreciated value of cattle listed.

The suit was removed to the Federal District Court and tried without a jury. In oral opinion not including specific findings of fact, the judge held that the drilling company was appellant's agent and that appellant was liable for damages to appellees in the sum of $8,136.00.[1]

In this appeal, appellant attacks the judgment on the grounds that: (1) under the law of Texas, he as mineral lessee had the dominant estate and could locate his well at any point on the leased premises he desired; (2) he was under no legal duty to fence or to cover the slush pits; (3) under the circumstances, there was no negligence in failing to fill the pits earlier than was done; (4) the evidence does not substantiate the finding that there was a causal connection between any negligence on appellant's part and the alleged damages; and (5) any negligence proved was on the part of Farmer, who was an independent contractor, not appellant's agent.

Conceding the dominance of the mineral lessee's estate, appellees agree that appellant was privileged to locate the well according to his pleasure, and they also admit that there is nothing in the lease or in the Texas jurisprudence affirmatively requiring appellant to fence or to fill the pits. But, they argue, the written lease and the Texas law hold appellant to reasonable use of the premises in carrying on his operations. Thus, they say in effect, when appellant knowingly located the well in the drainway of the tank it was incumbent upon him to exercise ordinary care and prudence to avoid pollution of the water; that when he failed to fill the pits after the expiration of the lease and allowed them to overflow into the watering tank, knowing that they contained dangerous chemicals, appellant breached the duty owed to appellees and became liable for the damages caused by his negligence. On the issue of causation, they point to the testimony of their veterinarian and to that of chemists who analyzed the water from the tank and the soil from the vicinity of the pits and

1. The trial judge stated:
"Under that lease he [appellant] had the legal right to locate that well where he thought it would be a profitable well, and he did that, but in doing that he located the well in the drainways of the water that came into the plaintiff's tank where his cattle that were grazing upon some 80 acres, sought water during the day, and the plaintiffs claim that by reason of the chemicals used in drilling the well, which was started in July, 1951, resulted in the death of their cattle, and the consequent damages that flow therefrom.

"Further, as to the facts, I find in addition to what I have already stated, that the defendant did not exercise due care which was incumbent upon him, and must be read into the lease, or contract, which he had from the plaintiffs for the right to drill the well. He may not locate a well in such position as would result in damages, unless such location was in the exercise of due care in the performance of that function.

"That lease, I also find, expired in September, 1951, and the defendant abandoned his location and moved his property off and did nothing about filling the drilling pits, or slush pits, there being three, two small, and one large, left openly exposed, knowing that the chemicals were in there, and that he is bounden, under the law, to know whether such drilling chemicals would injure or destroy cattle that used water that came through or over those pits.

"I find, as a conclusion of law, that judgment must go for the plaintiffs in the sum of $8,136.00, which covers items that legitimately flow and were the proximate cause of the actions of the defendant, and that the man who actually drilled for the defendant was the defendant's agent, and not an independent contractor."

found fluorides in contaminating quantities.

■■■ We think it clear under the law of Texas that even though a mineral lessee is held to enjoy a dominant estate over that of his lessor, there is upon him a general duty to make reasonable use of the premises in accordance with the provisions and general purpose of the lease and to exercise reasonable care in his use, having due regard to the rights of the owners of servient estates. Warren Petroleum Corp. v. Martin, Tex., 271 S.W.2d 410; Gulf Production Co. v. Continental Oil Co., 139 Tex. 183, 132 S.W.2d 553, 164 S.W.2d 488; Shell Petroleum Corp. v. Liberty Gravel & Sand Co., Inc., Tex.Civ.App., 128 S.W.2d 471. Since this general duty existed, it follows that any act or omission by appellant (or legally imputable to him) which was unreasonable or which should have been avoided in the exercise of ordinary care would constitute a breach of that duty; and this case must be approached from that point of view. It must be remembered, however, that the mineral lessee is not the insurer of a servient estate and that the Courts of Texas do not apply the doctrine of res ipsa loquitur against the lessee in such cases as this. Warren Petroleum Corp. v. Martin, supra; Carter v. Simmons, Tex.Civ.App., 178 S.W.2d 743. In an action by the owner of the servient estate for damages, the burden is upon him to produce evidence which, under the principles of the law of negligence, proves that the lessee breached his general duty and that the breach proximately caused the injury.

It is agreed by the parties, and it was recognized by the trial judge, that neither the selection of the well site, the use of drilling mud or the digging of the pits was, in itself, an act of negligence. Yet, it is self-evident that in taking such action, appellant was bound to know and to anticipate that natural drainage of rain water would carry solubles into appellees' watering tank; and he was further bound to recognize appellees' rights and to exercise reasonable care to protect those rights. Hence, the problem presented is whether the evidence shows he did or failed to do anything which, in the exercise of ordinary care, he knew or should have known would endanger appellees' cattle.

Considered in the light most favorable to them, appellees' evidence shows that the cattle began to sicken late in 1951 after the well was plugged and the lease had expired. Their condition deteriorated and eventually some of them died. After many examinations by several veterinarians, it was learned that the cattle were suffering from "dental fluorisis" as described in the complaint. The veterinarian who made the diagnosis gave his opinion that for some time the cattle had been consuming sub-lethal quantities of fluorides and that the eventual result was a dental condition which prevented them from eating and digesting their food properly.

Appellees' foreman testified that in *July, 1953,* he took samples of water from the tank and a sample of soil from between the slush pits for the purpose of chemical analysis. A chemist testified that he found fluorides in the water in the amount of three parts per million and in the amount of 200 parts per million in the soil. Chemical analysis of dead cattle's bones showed 500 parts per million.

The veterinarian further testified that he considered it questionable that fluorides in quantities of three parts per million would hurt the cattle but that he would "be concerned with over ten parts per million daily intake". He stated that the cattle could have gotten the fluorides from the water, food or forage and that he did not know the specific source in this case. No chemical analysis of the food and forage was made.

Finally, there is evidence to the effect that cattle had been kept on this land for many years and had never been affected with such a condition prior to the time the well was drilled; that one of the pits had been left uncovered for nearly eleven months after the well was abandoned and had overflowed several times.

We are doubtful that such evidence is sufficient to establish with the required degree of certainty that the fluorides which caused the sickness came from the drilling mud.[2] Yet, we may assume that appellees have successfully borne the burden of proof as to this point, and still must reach the conclusion that the evidence does not even *tend* to prove that any *negligent* act or omission on the part of appellant caused the fluorides to be present. There is nothing in the record to show the presence of fluorine or chlorine in the drilling mud when it was brought to the well site or to show that it was reasonably foreseeable that its use, exposure or combination with elements of the soil would or could cause the formation of fluorides. Quite to the contrary, evidence introduced by appellant shows that it is customary, even necessary, to use drilling mud; that the mud used here contained standard components, was of standard quality and was regularly used by expert drillers; that no one connected with the drilling operation or with the company which made the mud knew or had reason to suspect it contained or would result in the formation of fluorides; that until this case arose, none of these witnesses had ever heard of drilling mud causing fluoride poisoning.

In so far as this record discloses, neither appellant nor the drilling company did anything unusual or unreasonable in the entire operation, with the possible exception of inordinate delay in filling the pits; and without evidence indicating some reason for a person of ordinary care and prudence to anticipate such delay would or could result in chemical poisoning, that single fact is immaterial. We think the record is devoid of evidence tending to prove actionable negligence on the part of appellant or of the drilling company. Warren Petroleum Corp. v. Martin, supra. This being so, it is unnecessary to decide whether Farmer was an agent of appellant or an independent contractor.

The judgment is reversed, and the cause is remanded with instructions to enter judgment for appellant.

Reversed and remanded.

---

2. Compare Texas Pac. Coal & Oil Co. v. Truesdell, Tex.Civ.App., 187 S.W.2d 418; Carter v. Simmons, supra.