## No. 21071.

FRANKFORT OIL COMPANY, A DIVISION OF JOSEPH E.
SEAGRAM & SON, INC. *v*. HARRY R. ABRAMS, ETC.
(413 P.2d 190)

Decided April 11, 1966.

GORSUCH, KIRGIS, CAMPBELL, WALKER and GROVER, ROS-COE WALKER, JR., CHARLES M. STODDARD; of Counsel: ELDON E. SCOTT, GORDON, GORDON and JOHNSON, for plaintiff in error.

OAKLEY WADE, THULEMEYER & STEWART, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE SUTTON delivered the opinion of the Court.

THIS writ of error concerns the question as to whether damages awarded a landowner for use of his land under a lease by an oil company were excessive, as one side contends or were inadequate, as the other side urges. The parties appear in the same order as in the trial court, and they will hereinafter be referred to by name or as the plaintiff and defendant.

Frankfort Oil Company is a Texas corporation engaged in oil and gas exploration and production; it is authorized to do business in Colorado. As the holder of a mineral leasehold estate located in Kiowa County, Colorado, it initially filed a complaint seeking both a temporary and permanent injunction against the surface owner, Harry R. Abrams. Frankfort thereby sought to enjoin and restrain Abrams from interfering with its operations, its rights of ingress and egress, and from threatening persons who attempted such entry. The defendant filed an answer and added a counterclaim wherein he sought to recover damages in the amount of $1,500 for alleged injuries to the surface of his property.

Abrams later amended his pleadings, raising the demand in his counterclaim to $14,500. He claimed therein that Frankfort's drilling operations had in addition damaged four other sections of his land.

After a hearing, the trial court entered a preliminary injunction on December 14, 1960. Trial on the main issue was had to the court on December 19, 1962. Later, pursuant to a stipulation by the parties, the trial court issued a permanent injunction against Abrams. On August 28, 1963, some nine days prior to the granting of the injunction, the court awarded Abrams a judgment on his counterclaim in the amount of $4,737 with interest. Motion for new trial was dispensed with. This

writ of error is solely concerned with the question of the damages awarded Abrams, which the plaintiff contends are excessive, while the defendant asserts, by way of a cross-error, that they were insufficient.

Before setting forth the errors assigned, it becomes necessary to examine some of the pertinent facts in more detail. In his amended cross-complaint, Abrams sought damages to various portions of Sections 12, and Sections 13, 14, 23, and 24, Township 20 South, Range 49 West of the Sixth Principal Meridian. Issue was joined, however, only as to the West Half (W ½) and Southeast Quarter (SE ¼) of Section 12, the South Half (S ½) of Section 14, and the Northeast Quarter (NE ¼) of Section 23. Thus, Sections 13 and 24 are not involved here.

These lands were conveyed on April 16, 1957, by the State of Colorado to the defendant and his son as joint tenants under Patent Number 7022. Section 11, which was also mentioned in the patent, is not involved in this action. The patent contains the following reservation:

"RESERVING, however, to the State of Colorado, all rights to any and all minerals, ores and metals of any kind and character, and all coal, asphaltum, oil, gas or other like substance in or under said land, the right of ingress or egress for the purpose of mining, together with enough of the surface of the same as may be necessary for the proper and convenient working of such minerals and substances."

Prior to the date of the above deed, Colorado had leased the mineral estate reserved from the above-described land by means of Oil and Gas Lease No. 4623, Book 17, dated June 15, 1950 to one Ramon P. Colvert. Paragraph 11 of the lease provided:

"11. Lessee shall be liable and agrees to pay for *all damages* to the *land, livestock, growing crops or improvements caused by lessee's operations on said lands.* It is agreed and understood that no drilling operations shall be commenced on the lands hereinabove described unless and until the lessee or his assignees shall have

filed a good and sufficient bond with the lessor in an amount to be fixed by lessor, to secure the payment for such damage to land, livestock, growing crops or improvements as may be caused by lessee or his assignee's operations of said lands. When requested by lessor, lessee shall bury pipe lines below plow depth." (Emphasis supplied.)

There is in evidence, as Exhibit E, a written agreement executed by Abrams in August 1956 granting one of plaintiff's assignees consent to enter upon that part of Section 12 involved here (along with other lands). The grantee named therein is given express permission to enter, explore, drill, construct roads, tanks, pipelines, houses and other necessary structures and to perform its operations.

It was stipulated that Frankfort was the present holder of the lease in question and that Abrams owned the surface rights so "Neither party will have to prove title." It is also noted that prior to trial, the defendant's son assigned all his rights to the cause of action, which he may have had, to his father.

The court made the following conclusions of law which are relevant to this writ of error:

"1. That Harry R. Abrams is the owner of the surface of * * * (here properly listing the land located in Sections 12 and 14) and the North Half (N ½) and the Southwest Quarter (SW ¼) of Section twenty-three (23), * * *

"2. * * *

"3. * * *

"4. That Harry R. Abrams is a third party beneficiary under the terms of the oil and gas lease Number 4623 and therefore, Frankfort Oil Company has contractual obligations to him.

"5. That as a third party beneficiery Abrams has a right to maintain this action.

"6. That the question of whether or not Frankfort

used 'normal oil field practices' or was negligent is not an issue in this case and is immaterial.

"7. That should the question of negligence be material, then it is the conclusion of this Court that Frankfort failed to use normal field practices; that Frankfort was negligent in its gas field operations; and, that Frankfort's negligent acts were the proximate cause of Abrams' damages.

"8. That the prairie hay produced annually by Abrams is a crop within the meaning of the lease.

"9. * * *

"10. That the questions of dominant estate, servient estate, and public policy are not justiciable issues in this case."

"* * *"

In addition, the court made certain findings of fact and assessed certain damages, the substance of which will be treated hereafter with particularity when relevant.

Frankfort assigned various grounds as error which can be summarized as follows:

(1) That the question of negligence was not a justiciable issue, but that should it be found to be material, it was error to find that Frankfort was negligent in its operations.

(2) That depreciation in value to surrounding surface land owned by the defendant, but not used by the plaintiff, which depreciation allegedly occurred as a result of Frankfort's operations, is not a compensable item of damage for it constitutes *damnum absque injuria* notwithstanding Paragraph 11 of the lease.

(3) That if such depreciation is compensable, the court erred in including the West Half (W ½) of Section 23.

(4) That as to the land that *was* used, there was no evidence that 28 acres were permanently destroyed.

(5) That as to the land used, it was error to award the amounts given, as there was no evidence as to the value of the land before and after Frankfort's use.

(6) That it was error to award damages for injury to livestock, growing crops, a fence, a tractor tire and the loss of manhours in "policing the area," for these items were not specifically pled nor was evidence presented to support the findings.

(7) That if the items mentioned in (6) were properly pled and proven, it was error to:

(a) Award separate damages for all the items mentioned (excepting "growing crops") for their values should only be considered in determining the difference in the market value of the land used before and after operations;

(b) Award damages for the loss of the livestock because there was no evidence that the loss was caused by Frankfort's "operations" within the meaning of Paragraph 11 of the lease; and,

(c) Award damages for the loss of prairie grass grown on the land used, for this is not a "growing crop" within the meaning of Paragraph 11.

■ In his Answer Brief, the defendant, in addition to meeting Frankfort's arguments, asks that the writ of error be dismissed, alleging that R.C.P. Colo. 111(f) and 115(a) and (c) relating to format for briefs were violated, and assigns as cross-error a claim that the trial court's measure of damage was incorrect as "disregarding all theories of evidence." As to the claim for a dismissal, we find it to be without merit. As to the assigned cross-error, we need not consider it separately for it is adequately covered by our discussion and rulings hereinafter made.

We must first resolve under what theory Abrams' counterclaim was prosecuted. Was it in tort because he claimed that Frankfort's practices were negligent? Or was it in contract because he asserted that he was a third party beneficiary under the original lease — specifically Paragraph 11?

■ Our reading of the complaint, amended counterclaim and the stipulation in the Pre-Trial Order lead

us to the conclusion that liability, if any, was based upon the contractual provisions of Paragraph 11 of the lease. See: 1 C.J.S., *Actions*, §§ 46 and 47. In this regard, we note that the trial proceeded on that basis and the court, in its conclusions of law, was careful to state that the question of negligence was not treated as an issue in the case, but rather that Frankfort's liability was contractual. We hold, therefore, that any right of recovery was limited to the provisions of the lease.

■ Since Frankfort's liability, if any, is contractual, a preliminary question must be resolved as to whether Abrams has standing as a third party beneficiary under the original lease issued to Frankfort's predecessor prior to the time that the patent to the surface estate was conveyed to the defendant. We hold that he had such a status. *Haldane v. Potter*, 94 Colo. 558, 561, 31 P.2d 709 (1934); 17 Am. Jur. 2d, *Contracts*, § 304.

The second assignment of error raises the issue as to whether the trial court erred when it, in addition to awarding damages for the land used, granted the defendant the amount of $2,502. The latter sum represented the depreciation to the remainder of the surface land conveyed in the patent, but not used by Frankfort in its gas well drilling operations. Abrams contends that that land lost value due to Frankfort damaging part of his surface property.

■ Frankfort asserts that when the lease called for reimbursement to the surface owner for damages "to the land," it meant for the land *used* only. To hold otherwise, it contends, would negate the rights that Frankfort had as the owner of the dominant mineral estate, and that such a limitation was not contemplated by the lease. For reasons hereinafter given, we hold that land damages are limited to the surface used by Frankfort only and that the court erred in holding to the contrary.

■ Although Frankfort alleges that, upon a severance, a mineral leasehold becomes the dominant estate while

the surface becomes servient to the reasonable requirements of exploration and development, *Lynn v. Maag,* 220 F.2d 703, 705 (5th Cir. 1955), it is not necessary to classify these property rights so categorically. The rule is clear that a mineral lessee has "* * * a right to use so much of the surface as may be reasonably necessary for operation." 2 American Law of Property § 10.28; 1 Williams and Meyers, *Oil and Gas Law* § 218.7.

Here the mineral estate was severed from the surface and leased from the State of Colorado in 1950. Abrams' land, when the surface patent was obtained some seven years later, became encumbered by law with the rights of the mineral lessee, which reservation of rights was clearly stated in the patent. Abrams, however, also obtained the benefit of Paragraph 11 of the original mineral lease.

A very similar claim to the one propounded by Abrams was made in the case of *O'Connor v. Great Lakes Pipe Line Co.,* 63 F.2d 523 (8th Cir. 1933). There the owners of 480 acres of farm land sought to obtain as damages an amount of $1,200 for the alleged depreciation of their entire parcel of land as a result of operations carried on pursuant to a pipe line easement. The claim was based upon a clause in the agreement which provided for the reimbursement for "* * * *all damages to* crops, surfaces, fences and *premises for and because of the laying of each line* of pipe * * *." (Emphasis supplied.) In holding that the trial court was correct in refusing to submit the question to the jury on the basis that market value depreciation "* * * was not within the contemplation of the parties as an element of damages * * *," the appellate court, after noting that the right to damages is governed by the written contract, *not the law of condemnation,* stated:

"The words of the contract should, of course, be taken in their ordinary sense, * * *, and in construing the contract a court must, if possible, ascertain the mutual intention of the parties from the language of the contract

and the facts and circumstances attending its making. * * *

* * *

"The damage, if any, for which payment was to be made was provided by the contract. It was to crops, surfaces, fences, and premises, not by the granting of the easement, but by 'the *laying* of *each* line of pipe.' * * * Depreciation in the market value of the land was evidently not in the mind of either party *or different language would have been used. The agreement nowhere refers to this.* (Emphasis supplied.)
See also: *Fulkerson v. Great Lakes Pipe Co.,* 335 Mo. 1058, 75 S.W.2d 844, 846 (1934).

■■ The same rationale can be applied to the case before us. Paragraph 11 provides for reimbursement for "* * * *all damage to land,* livestock, growing crops or improvements *caused by lessee's operations on said lands* * * *." (Emphasis supplied.) Without a lease provision the rule seems to be that absent unreasonable use or statutory provisions or a suit brought in tort for negligence, no payment is due the surface owner for damage due to exploration or drilling. 4 Summers, *Oil and Gas* § 652 (perm. ed. 1962). It thus would appear that lease Paragraph 11 involved here was added by the state to the original lease to counteract such a rule and to give some relief to surface owners for damages due to the "operations" specified. Absent a *specific* lease provision to extend liability to cover the indirect loss of value of the remaining land, we find that the lease itself was intended only to cover loss due to lessee's actual authorized operations on the land used. See also: *Pitsenbarger v. Northern Nat. Gas Co.,* 198 F. Supp. 665, 672 (E.D. Iowa 1961).

Our holding is in accord with that in *Anderson-Prichard Oil Corp. v. McBride,* 188 Okla. 384, 109 P.2d 221, 224 (1940). There the owner of a preference right lease to the surface land sought as damages the depreciated value of the agricultural land and his corresponding

preference right. This was under a statute which provided that he was to be reimbursed for "* * * all damages or loss occurring to the surface interest in said land and all crops and improvements thereon * * *." The court there stated in denying such damages:

"* * * To hold otherwise would be to extend the obligation of the State for beyond the liability imposed by law, and would in a measure deprive the State of the rights inhering in it by virtue of its ownership of the land, and expressly reserved to it both by law and by the reservation in plaintiff's leases. It would place the State at the mercy of the surface lessee. When plaintiff leased the land, and purchased or erected valuable improvements thereon, *he did so with the knowledge of the right of the State to explore and operate the land for oil and gas, and with knowledge that such use by the State might affect the agricultural value and use thereof.* * * *" (Emphasis supplied.)

Because of our resolution of the preceding assignment of error, the third ground alleged is also answered, for the damage to this parcel, for which compensation was received, was for the depreciation to the land. We therefore need not entertain the argument that the land described was not owned by Abrams.

▇▇▇ We turn next to the fourth ground of error. Both the plaintiff and the defendant agree that the trial court erred in its finding that as much as 28 acres of land were used by Frankfort and were permanently injured. The court has assessed this damage as follows:

| SITE | FAIR MARKET VALUE BEFORE | FAIR MARKET VALUE AFTER | DAMAGE |
|---|---|---|---|
| Sec. 12 (6.8 acres) | $35.00 acre | 0 | $238.00 |
| Sec. 14 (6.4 acres) | 40.00 acre | 0 | 256.00 |
| Sec. 23 (14.8 acres) | 40.00 (sic) | 0 | 592.00 |
| 28.00 | | | $1,086.00 |

In arriving at its conclusion the court, at least in part, apparently used the testimony of Bruce Whitmore, an agricultural extension agent called by Abrams, to determine the amount of land permanently injured. Whitmore testified that 14.806 acres were damaged on Section 23. As to Section 14, though, he testified that some 7.346 acres were damaged and as to Section 12 his total figure was 3.081. His total figure came to 25.235 acres (although the correct total is 25.233. Abrams himself estimated that the total permanent damage involved 25 acres. The only other witness who made accurate individual measurements of all three sections was G. S. Elliot. He stated, using the previous sequence, that the amount of damage was a little less than 8 acres, 2 acres, and, a little less than 2 acres respectively, which he said totaled 12½ acres. Thus, there is evidence from which the trial court could find the amount of damage in Section 23. The evidence in the record as to Sections 12 and 14, however, will not support the finding relating to the land damaged in those Sections. Therefore, the cause must be remanded for further findings of fact and entry of a new judgment based on the evidence before the court as to this issue.

In its fifth ground, Frankfort alleges that it was error for the trial court to have found that after its gas operations were concluded, *all* the land described above had no value (whatever the corrected total may be). It is urged in this connection that there is no evidence which justified such a finding. After a careful reading of the record, we find that we must agree in part with Frankfort's contention.

 It should be observed that neither the plaintiff nor the defendant contest the rule of the measure of damages used by the trial court, namely the difference in the market value of the land before and after impairment. This is the correct method to arrive at the loss to the realty involved. *Dandrea v. County Commissioners*, 144 Colo. 343, 348, 356 P.2d 893 (1960).

Frankfort, however, asserts there is no evidence to apply such a rule. It is contended that Abrams offered testimony concerning the market value per acre, before drilling operations began, of *all* of the land that he owned in the three sections involved. In other words, Abrams did not limit himself to the value per acre prior to development of the *specific* land used by Frankfort. *A fortiori* it is contended that there was no evidence to sustain the court's finding that the market value of the land used before work began on Sections 12, 14 and 23 was $35, $40 and $40 an acre, respectively. We do not agree.

In considering the damage to a particular piece of property which is no different in quality or use from the remainder of the land wherein it is located, it is only logical to apply the appraisal per acre of the entire tract to a specific part thereof. In the instant case, one of the witnesses, Ollie Scoggins, a rancher and a real estate broker, who was called by the defendant, testified that in Section 12, the value of the surface of the land before Frankfort's operations began was $35 an acre. He further testified that Abrams' rights in Sections 14 and 23 were worth $40 an acre. These are the figures used by the trial court.

It is true that there were other witnesses who testified as to other values. That, however, only resulted in conflicting evidence. In such a case we have said too often to again cite authority that so long as there is some evidence to substantiate the trial court's findings of fact, they will not be disturbed on review.

We do agree with Frankfort, however, that no witness testified that *all* of the land which was damaged had no value whatsoever after the results of Frankfort's exploration and drilling were over and its land use shrank to a much smaller area. That statement, which the defendant attributes to one Philpy, but which was in actuality uttered by his own witness, Bruce Whitmore, was that "there is very little likelihood of (it) being revege-

tated." That is an incomplete quotation. When viewed in the context of the entire colloquy which occurred on cross-examination, it takes on an entirely different meaning:

"Q Mr. Whitmore, would you know what would be referred to as 'go-back' land?

"A Yes, sir.

"Q What is that?

"A Go-back land is land that has been plowed up and put in row crops or wheat, and then abandoned and allowed to go back to grass.

"Q As a matter of fact, Mr. Whitmore, this land that we are considering right now is in that category, is it not?

"A It is in a way; however, there is very little likelihood of (it) being revegetated.

"Q Why do you say that?

"A Well, where there are showings of oil (where the waste sludge pits were dug, used and then filled over), that would probably have to be removed, along with the chemical in order to make the land ready to be revegetated.

"Q That would be a very small portion of this entire acreage that you are referring to?

"A Yes.

"Q That you measured, is that true?

"A Yes, that's right.

"Q Probably less than five acres?

"A That's right, * * *."

This witness then testified that the time to cultivate "go-back" land effectively takes 30 to 40 years, and also that not all the damaged land was without grass. The important point is that his testimony leads to only one conclusion, *i.e.*, that at least a portion of the damaged land still has some value.

Although four witnesses testified that some of the land was either "barren" or damaged, only two, Bruce Whitmore for the defendant and G. S. Elliot, a real estate

broker and State land appraiser for the plaintiff, gave some evidence, though incomplete, on the question as to how much of the land was totally destroyed. Elliot testified that 50% of the land which he had measured as damaged property, or 6¼ acres, was taken out of production. Specifically what land he was earmarking as having been totally destroyed is not made clear. This information is necessary to calculate damages, in light of the different land values placed on the acreage in different sections by the trial court.

In summary then, the evidence indicates that some land was totally damaged and that some land lost value because of the time necessary before regrowth would occur. In order to determine the amount and location of each affected parcel of land it is necessary, therefore, to have specific findings by the trial court thereon. For this reason this phase of the case is also reversed and remanded.

Plaintiff, as its sixth ground, alleges that it was error to make an award for special damages asserted as to the hay crop, livestock, a fence, a tractor tire and costs of labor in that these items were neither pled nor proved. The record supports this contention as to the pleadings concerning everything except the loss of the crop. Cf. R.C.P. Colo. 9 (g). The items in question, except the crop, did not follow "naturally and ordinarily" from the injuries to the land involved and so could not be proved in the absence of being pled. The hay crop, however, is well within the wording of the crossclaim which asserted that there was "destruction of vegetation." See: *City of Pueblo v. Griffin*, 10 Colo. 366, 367, 15 Pac. 616 (1887); *Tucker v. Parks*, 7 Colo. 62, 1 Pac. 427 (1883); 22 Am. Jur. 2d, *Damages*, §§ 272, 273. Therefore, that part of the judgment which awarded $309 for items other than crops is reversed.

As to the loss of "crops," as mentioned earlier, the defendant averred in his pleadings that the damage included the "destruction of vegetation" which it appears

was natural prairie grass. The issue then becomes one as to whether prairie grass was a "growing crop" within the meaning of the lease. Frankfort's attorney, Christian K. Johnson, narrowed the issue even further when he admitted that the grass might be considered a "crop" after harvesting but not so long as it is used for grazing when he said:

"If the Court please, I think our position might be that this grass might become a crop when harvested as hay and used for a particular purpose, but that (it) is not necessarily a crop when used for livestock for grazing, when it is not intended to be cut as hay. * * *"

An excellent discussion of this problem is found in 87 A.L.R.2d 235. That annotation follows the reporting of the case of *Superior Oil Co. v. Griffin,* (Okla.) 357 P.2d 987 (1960). In *Griffin* the court stated that certain annual re-seeding prairie grasses were "growing crops" within the meaning of a provision of an oil and gas lease which provides for the payment of damages. The court specifically pointed out that the test is not whether the grass is in fact left as a pasture or is harvested as hay or as a seed crop, for this "* * * would mean that the status of the crop could change from year to year or from time to time during the year." Rather, the court says:

"* * * We are of the opinion that where * * * grasses are seeded for either pasturage, meadow, or seed crop purposes, the resulting crop should be treated as a growing crop within the purview of the provisions of an oil and gas lease to the effect that damages will be paid for damage to or destruction of growing crops."

Some of the testimony on this issue here was that this particular grass was used for "forage or feed"; that "It is cut for hay whenever the seasons are propitious."; that Abrams "cut hay every year" on his land; that Abrams, when he first located on the land in 1952 seeded it and used deferred grazing practices to stimulate the grass's growth; and that on at least one section, since 1959, an

acre would produce about a ton of hay. We consider this evidence sufficient to show that the grass was more than mere "pasturage," and rather that it should be considered a "growing crop" within the meaning of the lease.

■ We find, therefore, that where the evidence shows that prairie grass has been used for both pasturage and haying purposes; it is to be considered a "growing crop" under the terms of an oil and gas lease provision as it appears in the case at issue. Cf. *Wohlford v. American Gas Prod. Co.*, 218 F.2d 213 (5th Cir. 1955), where the native grass was never plowed or used for hay, but only as pasturage and where it was held not to be a "growing crop" because it was a natural product of the soil and not the result of planting, cultivation and labor.

■ Frankfort next asserts that even if this was a growing crop, the evidence was insufficient to support the court's findings that a ton of hay per acre (per year) was being produced around the well sites, or that it should be valued at $30 per ton as was done by the trial court. Without being drawn too far into that spider web and its multitude of ramifications, we can say that as to the crop yield, Abrams testified that "* * * the total acreage damaged on all three sections add(s) up to twenty-five acres * * *." He then testified that his loss was twenty-five tons of hay valued at $30 per ton. We have held that it is proper for an owner to testify as to the value of his own property. *Grange Mutual Co. v. Golden Co.*, 133 Colo. 537, 298 P.2d 950 (1956). We have also held that damages to crops must have a relation to time and place, and such value must be fixed at the time of loss. *Smith v. Eichheim*, 147 Colo. 180, 183, 363 P.2d 185 (1961). Here the court made no such finding.

■ The evidence is that the oil well on Section 23 was begun on February 8, 1960, while the well located on Section 14 was started in December of 1959 and completed in January of 1960. It appears that the well on

Section 12 may have been drilled at the same time as the one located on Section 23, although this fact was not clearly established and evidence should be taken as to this point. What the condition of the hay was at these times cannot be established for lack of evidence. We refuse, as requested by Frankfort, to take judicial notice that during the months of December, January and February grass in Kiowa County lies dormant, for the condition of the grass during these months in the particular year of 1960 is a fact to be determined by proper evidence. Weather and moisture available and their effect on a particular crop at a particular time and in a particular place certainly are not constant.

Should the evidence yet to be taken show that the hay was of sufficient development to be considered an "immature" crop, and the injury excluded root damage, the court in the case of *Colorado Consol. L. & W. Co. v. Hartman*, 5 Colo. App. 150, 152, 38 Pac. 62 (1894), as cited with approval in the case of *Hoover v. Shott*, 68 Colo. 385, 387, 189 Pac. 848 (1920), set down three methods of establishing damages, any one of which is appropriate:

"* * * One might be a year's rental value, with the cost of planting and bringing forward the crop until the time of its loss; another, what the crop would bring in its immature state at sale; and a third, the proof of the average yield and the market value of crops of (the) same kind planted and cared for in the same manner, less the cost of maturing, harvesting and marketing. * * *"

If, however, the facts to be established show that there was damage to the roots as well, as to those portions of land so injured, the measure of damages becomes the difference in the market value of the involved land before and after the destruction, including in the value of the land before destruction the value of the immature crop if there was one. See: *Dandrea,*

*supra; Colorado Springs Rapid Transit Ry. Co. v. Albrecht,* 22 Colo. App. 201, 204, 123 Pac. 957 (1912).

For the reasons given, that part of the judgment granting $2,502 for depreciation of the land in the ranch unit which was not used and $309 for special damages not pled is reversed. That portion of the judgment granting $840 for crop damage, *i.e.,* loss of hay on 28 acres at $30 per ton per acre for the year involved is reversed with directions to compute the correct amount of acreage involved in accordance with the evidence and our views expressed in discussing the fourth ground of error; and, on re-trial to allow the offering of evidence as to the hay crop's condition when damaged, the cost of harvesting and other necessary facts in order to determine Abrams' true loss in accordance with the rules enunciated in the cited authorities. After such determinations judgment is to enter therefor. And, that portion of the judgment awarding $1,086 for damage to the land actually used in the drilling operation is also reversed with directions to compute the correct number of acres, also as discussed in the fourth ground of error, and to divide this acreage, on this issue, into land surface permanently destroyed and land that has a go-back value. Evidence to be taken on the re-trial in order to determine which land falls into which category and what the before and after values thereof are. The court to make its findings and enter judgment accordingly.

MR. JUSTICE FRANTZ specially concurring in the result, and MR. JUSTICE McWILLIAMS not participating.

MR. JUSTICE FRANTZ specially concurring in the result:

Although I concur in the result reached by the majority, I would confine the holding of the case to its particular facts.

The main question presented on this writ is whether or not depreciation to surrounding land caused simply by the presence of a wellhead or similar installation is

compensable under paragraph 11 of the Colorado Oil and Gas Lease operative in this case. I agree it is not, but would go no further than that.

The court goes far beyond this with its language. It holds "that land damages are limited to the surface *used* by Frankfort only . . ." (emphasis supplied), never defining what is meant by the term "used" other than to later refer to the "operations specified" and "the actual authorized operations on the land."

"Use" is a relative term. The majority claims it has so used it but this is too subtle a reading of its remarks for me to comprehend. In my view it should specifically be understood by those who would look to this case as authority that it in fact holds only that mere presence on part of leased land is not necessarily a use of the remainder. Other "operations," as that term appears in the lease, could be a partial taking and, therefore, a compensable use.