**AMOCO PRODUCTION COMPANY, a Delaware Corporation, Plaintiff,**

v.

**THUNDERHEAD INVESTMENTS, INC., a Colorado Corporation, Defendant.**

**No. CIV.A.01–B–354 (BNB).**

United States District Court, D. Colorado.

Dec. 9, 2002.

Thomas P. Dugan, Dugan & Associates, PC, Durango, CO, for Plaintiff.

George Robert Miller, McDaniel, Baty and Miller, Durango, CO, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

BABCOCK, Chief Judge.

### I. Background

Trial to the Court was held December 2nd and 3rd, 2002. Thunderhead Investments is a Colorado corporation that owns a 40–acre tract of land located in the SE1/4SW1/4 of Section 1, Township 34 North, Range 7 West, N.M.P.M., La Plata County, Colorado ("the Property"). The land is adjacent to the Town of Bayfield, Colorado. Amoco, a Delaware corporation, owns the oil-and-gas estate in the Property pursuant to an oil-and-gas lease ("the Lease") granted to it in 1988 by the owner of the surface and mineral estates at that time.

Scott Fleming, a principal in Thunderhead, purchased the surface estate in 1994 by a deed that granted title to the surface subject to all oil and gas leases of record. The deed specifically included and referenced the Lease. The deed excepted and reserved to the grantors all coal, oil, gas and other minerals. Title to the surface estate was transferred from Fleming to Fleming and his wife as joint tenants, and then to Thunderhead. It is not disputed

that Thunderhead owns only the surface rights to the Property.

Thunderhead's surface title is junior and expressly subject to the Lease. Other persons, including property owners to the east and northeast, hold easement rights in portions of the surface of the Property along its northern boundary, specifically a 60–foot easement. The Property is unimproved, and is currently used for hay production and horse grazing. The Property remains a part of the unincorporated territory of La Plata County. A public middle school is located on property immediately north of the Property. A private residence (the "McNew Residence") is situated on property immediately west of the Property.

Thunderhead applied twice to the Town of Bayfield for annexation and subdivision of the Property. Two preliminary plats were approved. However, the town has never annexed the Property or approved a final subdivision plat. Bayfield requires two access roads for any future subdivision on the Property. One likely would be a short southward extension of Cedar Drive on the north side of the Property. However, Thunderhead would have to create the southern access road. This is a major obstacle to final plat approval. Thunderhead would need easements from property owners south of the Property for the access road. It does not have such easements and none are pending. Thunderhead also must finance construction of the road and an interchange to connect it to Highway 160 to the south. This cost is estimated between $1 and $1.5 million. There is no evidence that plans are underway to construct the southern road.

Amoco and Thunderhead never reached a surface-use agreement regarding a well location or Amoco's access to the well. The Colorado Oil and Gas Conservation Commission (COGCC) requires setbacks for the well: 1) a minimum of 150 feet from the well to any surface property line (COGCC Rule 603a.2)); 2) at least 350 feet from the wellhead location to any building unit or educational facility (COGCC Rule 603b.2)); and 3) at least 350 feet from the gas-production equipment to any building unit (COGCC Rule 603b.3)).

On or about December 15, 2000, Amoco filed with the COGCC an Application for Permit to Drill (APD) a Fruitland coal-bed methane well on the Property. The proposed well location in the APD complied with all state and local regulations. On March 2, 2001, Amoco received permits from the COGCC and from La Plata County to drill on the Property within the spacing unit approved by the COGCC. The COGCC amended its permit by a Sundry Notice modifying the surface location of the well from that listed on the drilling permit to a location designated by the COGCC described as 1180 feet from the south line (FSL) of the Section and 1515 feet from the west line (FWL) of the Section. This location is within a 23–acre drilling window designated by the COGCC.

Amoco drilled the well, Neva Dove Unit A # 2, in late November and early December, 2001. At approximately the same time, Amoco built a gravel access road to the well pad running east-northeast across the northern portion of the Property. Amoco also buried water— and gas-gathering lines approximating but not exactly following the route of the road. The well as built meets all COGCC setbacks from the school, nearby residences, and property lines.

**Claims**

Plaintiff states one claim for declaratory judgment seeking four declarations. First, it contends under the present circumstances it was not required to request variances from state setback and safety regulations. Plaintiff argues it already moved its well site at Defendant's request.

It contends each of the other alternative sites Defendant suggests: a) is outside the drilling window prescribed by the COGCC, b) violates COGCC's set-back requirements, or c) is otherwise unreasonable.

Second, Plaintiff contends it has reasonably accommodated Defendant's surface use. Plaintiff contends it has accommodated present use of the land as a pasture. It argues it has also "in many ways and at great cost" accommodated possible future development of the Property. Third, Plaintiff asserts it is entitled to use and maintain the access road it built to its well. Plaintiff contends the road is required by state and local permits and is reasonable. Finally, Plaintiff contends its sound mitigation is sufficient. Plaintiff contends it has achieved sound levels lower than those allowed by state law through the use of electric motors at Thunderhead's request. Defendant no longer contests issues related to sound.

Defendant states a counterclaim for declaratory judgment. Defendant does not seek injunctive relief or damages. Defendant contends its counterclaim is for trespass due to actual, unreasonable surface use. Defendant requests the following declarations. First, it contends Amoco trespassed when it unreasonably located its gas- and water-gathering pipelines outside the purported easements Defendant unilaterally granted to Amoco. Second, Defendant contends Amoco trespassed and acted unreasonably when it denied Defendant the right to designate a reasonable well location, opposed Defendant's suggestions regarding reasonable well locations, and drilled in a location that unnecessarily adversely impacted Thunderhead's surface use.

Third, Defendant asserts Amoco's pumper will have reasonable access to Neva Dove Unit A # 2 on proposed subdivision roads and trails, and Amoco's workover and drilling rigs will have reasonable access on subdivision trails. Defendant does not dispute issues related to sound, electric lines, or its ability to cross Plaintiff's gathering lines.

## II. Findings of Fact

Colorado Revised Statute § 34–60–101, *et seq.* (2001), the "Oil and Gas Conservation Act," established the COGCC. The Act grants the COGCC authority to promulgate regulations in many areas, including the health, safety and welfare of the general public and any person at an oil-and-gas well. C.R.S. § 34–60–106(10) and (11) (2001). The COGCC also is authorized to establish drilling and production units. *Id.* at (16). Finally, the COGCC is required to prevent waste and to protect the correlative rights of owners in every well field or pool. *Id.* at (17).

Amoco and other gas operators applied for and received generalized permission to drill optional or additional wells in the Fruitland coal formation underlying certain lands and spacing units within La Plata and Archuleta Counties in Colorado. COGCC Cause No. 112, Order No. 112–156 approved these "infill" wells. The order covers the Property. The COGCC entered the order because the commission found that the additional wells would result in the recovery of more of the state's natural resources as mandated by C.R.S. § 24–33–103.

Permission to drill an infill well in a spacing unit is a "general" permission in the sense that it does not authorize drilling any particular well. The order only provides that a second well may be drilled within the designated 23–acre drilling window for each 320–acre spacing unit. The drilling windows provide regional well set-backs so wells are spread out enough to cover and penetrate as much of the Fruitland coal bed as possible without overlapping well draining. In order to drill under the order, the gas operator must file

a well-specific APD with the COGCC. The operator may also be required to obtain permits from one or more additional regulatory agencies or governments (*e.g.*, county) depending on site-specific facts. At the time any APD is filed with the COGCC, the applicant must then present specific information regarding, and a proposed location for, the requested well.

Typically, the gas operator and surface owner come to terms regarding certain aspects of a proposed well. Of approximately 140–150 infill wells drilled by Amoco in La Plata County, Neva Dove Unit A # 2 is the only one without a Surface Use Agreement. In the absence of such an agreement, the COGCC mandates that an onsite inspection be conducted in order to identify any potential public health, safety, and welfare, or significant adverse environmental impacts. The COGCC's 23–acre drilling window for Neva Dove Unit A # 2 consists entirely of developed and improved land except for that part of Thunderhead's property which is located in the southeast part of the window. Because the subject well is located within 1,000 feet of an educational facility, the COGCC's high-density area rules apply pursuant to COGCC Rule 603.b.

The COGCC's Southwest Colorado Operations Manager, Morris Bell, conducted an onsite inspection of the Property on January 27, 2001 in the area in which Amoco proposed its well. The inspection was attended by nearby property owners and by representatives of Amoco, Thunderhead, School District 10 JTR, La Plata County, and Bayfield. The public middle school includes a school building, a bus stop and "turnaround area" close to its southern property line, as well as a playground with a baseball field and dugout. The school district did not waive the benefit of regulatory setbacks. The owners of the McNew Residence did not waive the benefit of regulatory setbacks. Moreover, none of the owners of other residences in the immediate area waived the benefit of regulatory setbacks.

At the on-sight meeting, Thunderhead's Scott Fleming proposed a well location much further to the north and west than Amoco had proposed. Safety setbacks prevented Morris Bell from considering a site as far north as Thunderhead requested. However, pursuant to Thunderhead's request, he directed Amoco to evaluate a well location further to the north and west from the site set forth in Amoco's APD. This location met setback requirements because at the on-site inspection La Plata County waived compliance with its 400–foot setback from the nearest residence to the well-site perimeter. Amoco did not know, and did not expect, that the county would make such a waiver. Amoco agreed to consider the location. The final location of Neva Dove Unit A # 2 was the result of Thunderhead's request that the well be moved northwest of the APD location.

As a result of the on-site inspection and requests made by Thunderhead, the COGCC attached conditions to Amoco's COGCC permit, including:

1) Use of electric motors on all production equipment;

2) Use of a low-profile pump shall be used first, if artificial lift is necessary and if such pump is effective;

3) Use of a horizontal or low-profile production separator;

4) Any water tank at the site is to be ten feet or less in height;

5) Reclamation of the well pad after completing the well, including reseeding;

6) After drilling, subsequent operations are to be conducted during daylight hours;

7) A provision for completing an "as built" survey;

8) Gas and water lines shall be buried to 48 inches where practicable and located as close to the northern property boundary as practicable;

9) Minimal gravel areas at the wellsite.

The La Plata County permit for Neva Dove. Unit A # 2 generally depicts the approved well location and layout of related facilities. It requires Amoco to offer money to adjacent property owners to pay for landscaping (visual mitigation) on their properties. Amoco paid the $10,000 in aggregate to the property owners. The county permit also requires that if the Property is developed in the future, Amoco will deposit $25,000 with the local government that has jurisdiction at that time to be used for landscaping at the wellsite.

On August 30, 2000, Scott Fleming responded to Plaintiff's notice of intent to drill by informing Plaintiff that the drill site is included in the preliminarily planned Los Pinos subdivision. Fleming provided Amoco with a copy of the Los Pinos Subdivision Preliminary Plat Plan. After meeting with Fleming on October 8, 2000, Scott Thompson, an Amoco Landman, wrote Fleming regarding the well. At that time, Thompson was aware of the Los Pinos subdivision and had been provided a proposed subdivision plat. On October 30, 2000, Thompson e-mailed Amoco personnel that:

[t]here are now three possible locations [for the Neva Dove Well] any of which will work for Amoco: First proposed location staked in drilling window, second proposed location in green space as shown in his proposed development, third proposed location is a legal location that meets high density set-back requirements.

On November 17, 2000, Thompson described the second location as follows:

[t]his location was selected to cause minimal impact to your desired surface activities. It is in an area you propose to

set aside as open space and it should not physically impact any of your possible locations for surface development. This location is 1200' FSL, 1660' FWL, and the elevation is 7025'.... Amoco believes that Location No. 2 is the best location for the well from your perspective, based upon what you have told us. This is because it will minimize any impact to your potential surface development areas. The access road will be routed from the East so as to cause minimal impact, and [it] will not physically cross any of the areas you identified as possible residential sites.

Brian Stepanek, Amoco's Infill Project Drilling Coordinator, testified credibly as a fact and expert witness. He noted the second location (1200' FSL, 1660' FWL) was "probably the best location, but not in compliance with" COGCC and county setbacks. Amoco understood that in order to drill the second location, the state would have to grant it setback variances. When Amoco filed its application for a permit to drill its well, it staked the well at a location 975' FSL, 1665' FWL, in the center of one of Thunderhead's proposed largest pods of residential lots. Stepanek testified that any preference Amoco might have stated accounted primarily for COGCC and La Plata Regulations and secondarily for the preferences of Defendant or other neighboring property owners.

Thunderhead's Scott Fleming proposed alternative locations for the well many times before Amoco drilled the well. He suggested the well be located approximately 1260' FSL, 1660' FWL, in proposed open space. The location would have required an exception to COGCC setback requirements, but would have alleviated the need for re-design, re-engineering, and re-consideration of the Los Pinos subdivision. Fleming proposed the well be located on open space south of the drilling

window designated by the COGCC. Defendant contends this location would not have required an exception to COGCC setback requirements if a deviated well (slant hole) were drilled. But if a straight hole were drilled, COGCC approval of an exception location would have been required. Fleming argued either way this also would have alleviated the need for re-design, re-engineering, and re-consideration of the Los Pinos subdivision. Defendant contends this was a reasonable alternative.

The COGCC in its order approving San Juan basin infill wells specifically noted:

Directional drilling from common surface locations is not a cost-effective or technically feasible option to mitigate surface impacts on 160–acre Fruitland coal seams well density because of the shallow (approximately 2000') target top depths, the long (average 2640') displacements and the resulting complications for artificial lift.

Brian Stepanek testified credibly at length that this southern location was not reasonable. First, a vertical well would encroach on the rights of approximately 80 mineral owners to the south. Those mineral owners would have to waive their rights to the Fruitland gas before Amoco could drill. There is no reason to believe they would do so. Moreover, the coal is thicker to the north, and production is greater in Neva Dove Unit A #1 to the north than in the well to the south.

Stepanek testified that directional drilling from the southern open-space surface location at an angle into the coal bed below the drilling window to the north would be problematic and ultimately not feasible. First, the coal bed depth is approximately 1,500 feet. A 46–degree slant would be necessary. The tested limit in La Plata County is 36 degrees. Second, the angle and distance to the coal bed would require a longer bore hole and additional equipment. It is difficult to steer the drill at

such an angle for such a distance, especially through the boulder-rich substrate found in the area. Third, cement used to secure the well-pipe casing to the drill hole often settles unevenly, undermining the integrity of the hole. Fourth, directional drilling under the circumstances requires more water and gas pumping than normal, in part because the water tends to settle on the low side of the pipe. Pumps are usually powered by natural gas captured from the well itself. At Neva Dove Unit A # 2, electric motors are required, so pumping costs are much higher. Fifth, out of 140–150 infill wells in the San Juan Basin, only 10 are directional. Of those, all have significant problems.

On or before the on-site meeting, Fleming also suggested a well site 80 feet south of his northern property line. This requested location would have violated the safety setbacks calculated from property lines, buildings, public roads, the middle school, and the middle school baseball dugout. Fleming testified he thought Plaintiff should have requested a variance for some of these setbacks. The evidence showed that the COGCC likely would not grant variances for the safety setbacks.

Finally, Fleming suggested the gathering lines be routed directly north from the well and run eastward within ten feet of the northern Property boundary. The COGCC Permit reasonably accommodated his request: "[t]he gas and water flow lines shall be routed to the east of the location as close to the northern property boundary as practicable." Amoco routed its lines in an east-northeast orientation, "as close to the northern property boundary as practible."

Amoco's John Mummery testified credibly as a fact and expert witness. He testified that physical obstacles played a critical role in Amoco's location for its water and gas lines. It had to avoid a 60–

foot access easement along the northern property line in favor of property owners to the east and northeast, and a ditch-company easement for an irrigation canal. Amoco was forced to stay far enough away from the irrigation ditch running through the Property to prevent destabilizing the supportive ditch berm. Amoco bored a hole for the lines in one section to prevent the disruptive effects of trenching. It also had to negotiate a route around an oak tree stand on the northern edge of the property east of the well. Moreover, Amoco had to avoid irrigation pumping equipment and a power line running south from the northern boundary to that equipment. Where appropriate, the water and gas lines were buried 14 feet deep at a cost of $150,000, and five feet deep otherwise at a cost ten times less. Amoco used trenching and boring methods common in the oil-and-gas industry to bury these lines. Thunderhead's Scott Fleming testified that this was a "good" depth for him and that he could run his sewer, water, and other utility lines over the deeper pipes if and when his subdivision was approved and built.

Plaintiff did not include Thunderhead in discussions with the ditch company and the Southview Property owners to the east about possible gathering line and road locations. But the road and gathering lines cross the ditch at a perpendicular point required by the ditch company.

On January 26, 2001, the day before the on-site meeting, Scott Fleming proposed surface-use conditions for Neva Dove Unit A # 2. He informed Amoco that its gas— and water-gathering lines should be located within 10 feet of the north boundary of Thunderhead's property, in order to avoid unnecessary interference with and re-design of the Los Pinos Subdivision. He told Amoco that no permanent road should be maintained to the well pad or production area. He suggested Amoco's pumper should "walk" to the Neva Dove well from Oak Drive or from a subdivision road. As a trial witness, Fleming testified that what he really meant was that Amoco's well and pump personnel should drive their vehicles and equipment slowly across the Property without a road. Fleming testified this was the meaning of "walk" in the construction industry. That may be so but I am unconvinced that was his meaning or intent at the time. Scott Thompson testified that Thunderbird's demands were unreasonable. During trial, Fleming testified that Amoco's access road, as it is now built, is "O.K."

Even after the on-site meeting, Thunderhead continually attempted to influence Amoco's logistical decisions. For example, on October 1, 2001, without consulting with Amoco or sharing preliminary drafts with Amoco, Thunderhead recorded a Grant of Right-of-Way and Easement that conveyed to Amoco a non-exclusive right-of-way for one water— and one gas–gathering line to be located within 12 feet of Thunderhead's northern property line. Also on October 1, 2001, Thunderhead unilaterally recorded a Grant of Right-of-Way and Easement that conveyed to Amoco a non-exclusive right-of-way for an underground electric line to be located within 10 feet of the northern boundary of the Property.

On December 4, 2001, Plaintiff filed a Notice of Non-Acceptance of the granted easements. Amoco stated it did not accept the easements in part because under the Lease Amoco could place its gathering and electric lines without an express easement. After completing Neva Dove Unit A # 2 in December 2001, Plaintiff provided Thunderhead with an "as-built" survey of the gas— and water-gathering lines, electric line, and access road.

### III. LAW

Jurisdiction rests on diversity. I apply Colorado law.

■ "The owner of a severed mineral estate or lessee is privileged to access the surface and use that portion of the surface estate that is reasonably necessary to develop the severed mineral interest." *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 926 (Colo.1997). *See also, Frankfort Oil Co. v. Abrams*, 159 Colo. 535, 413 P.2d 190, 194 (1966); *Rocky Mountain Fuel Co. v. Heflin*, 148 Colo. 415, 366 P.2d 577, 580 (1961) ("The owner of a mineral estate has rights of ingress, egress, exploration, and surface usage as are reasonably necessary to the successful exploitation of his interest."). *Gerrity* is the leading case in Colorado on the subject of reasonable accommodation in the oil-and-gas context. Because the oil-and-gas industry is highly regulated, *Gerrity* must be read in the context of matters covered by statute, regulation, and lease terms. The essential disputes in this case are covered by statute, regulation, and lease terms. Therefore, state and county regulations and lease terms provide the major legal framework for this case. Critically, they address fundamental health, safety, and welfare concerns. C.R.S. 34–60–106(10) and (11) (2001).

■ A mineral owner must have "due regard" for the rights of a surface owner. *Gerrity*, 946 P.2d at 933. To make a *prima facie* case for relief a surface owner must establish a material interference with surface use. *Id.* "Evidence that the operator's conduct was merely inconvenient to the surface owner is insufficient." *Id.* Even if there is an interference with surface uses that is material, the mineral owner may justify his conduct by showing that it was "reasonable and necessary." *Id.* However, there is no requirement that the mineral operator's use must be limited by the presence of any alternative requested by the surface owner. *Id.* The alternative must be a "reasonable alternative" under all the circumstances. *Id. See also, Smith v. Linmar Energy Corp.*, 790 P.2d 1222,

1224 (Utah Ct.App.1990) ("... [T]he lessee is not required to utilize any possible alternative, but only one that is both 'reasonable and practical under the circumstances.' ").

■ The *Gerrity* court further stated:

[T]he operator must present evidence, by means of expert testimony or otherwise, that explains why its surface conduct was reasonable and necessary [from the perspective of the operator, and ...] present evidence that its operations conformed to standard customs and practices in the industry.

*Gerrity*, 946 P.2d at 933. Finally, the mineral owner is not required to accommodate a surface owner's reasonable requests where there are contradictory regulatory requirements. *Id.* at 926.

Thunderhead urges that RESTATEMENT (THIRD) OF PROPERTY, SERVITUDES § 4.8 (2000) be adopted here in the oil and gas context. Yet, the very first section of the RESTATEMENT is entitled "Servitude Defined: Scope of Restatement." It states:

Servitudes are used in several specialized areas where the rules and considerations governing their operation are different from those ordinarily applied to the servitudes covered in this Restatement. Landlord-tenant law, real-property security law, *oil and gas law*, timber law, and the law governing extraction of other minerals *are such specialized areas. No attempt has been made in this Restatement to take account of the special rules and considerations governing servitudes used in those contexts.*

RESTATEMENT § 1.1 cmt. e (2000) (emphasis added). Application of this secondary authority would contradict the authors' clear intentions and run contrary to the Colorado Supreme Court's ruling in *Gerrity*.

The RESTATEMENT OF THE LAW OF PROPERTY, SERVITUDES does not apply to this case.

## IV. Discussion and Conclusions of Law

■ Thunderhead argues Amoco did not adopt the least-intrusive, reasonable alternative means of access to its minerals contrary to *Gerrity*. Therefore, it contends Amoco's use is excessive and constitutes a trespass. I disagree.

The first question is whether Amoco's well and associated infrastructure complies with state and local regulations, permits, and the Lease. Amoco complied with all the COGCC setbacks and other regulations that govern the well. Amoco complied with all applicable La Plata County regulations. It complied with the COGCC and La Plata County permits. Amoco also complied with the terms of the Lease.

The next question is whether Amoco, given its obligations to comply with those regulations and agreements, selected "reasonable alternatives" necessary under the circumstances. *See Gerrity*, 946 P.2d at 933. Evidence that Amoco's surface use is merely inconvenient for Thunderhead is insufficient. *Id.* For the following reasons, I conclude that Amoco's choices were reasonable and necessary in conformity with standard industry customs and practices.

### Gathering Lines

Amoco installed its water— and gas-gathering lines in a reasonable and necessary manner. Amoco installed the lines using methods common and acceptable to the industry. Their depth allows space for Defendants' future utilities. Their location was reasonable and necessary in light of physical considerations (the canal, trees, and pumping equipment). Their location respects the legal rights of various owners of interests in the surface estate (the 60–foot access easement, the ditch company's canal easement, the irrigation lines). Given these considerations, the lines were placed as far north as practicable.

### Access Road

Mr. Fleming testified that the access road as it now stands is "O.K.," but has continually requested that Amoco use proposed subdivision roads for access to its well. Thunderhead requests that if the surface is developed for a future residential subdivision, Amoco utilize subdivision roads for partial access to the site and then have its workers walk to the wellsite. There is no certainty as to if and when residential development may occur, whether Bayfield will annex the Property, what the road locations and specifications would be, and whether Amoco's equipment would meet Bayfield load requirements. Beyond this general statement, I am unable to speculate about potential, future conflicts in the absence of a real, present controversy based on concrete evidence. Neither a subdivision nor its roads exist. Bayfield will not allow Defendant to build until it has been granted easements from southern property owners for, and financed, a southern access road. Amoco cannot be required to access its well site without a road. Subdivision roads are speculative at this point and subject to unknown future events.

Future work on the subject well can range from minor operations (albeit still involving tools and heavy equipment) to those requiring large rigs. Requesting that rigs and equipment be transported to the wellsite without a road is not a reasonable alternative method of operation. In Colorado, no judicial decision has directly addressed the question whether a road is a reasonable use of the surface by a mineral lessee. However, COGCC regulations require that a wellsite within 1,000 feet of a school have a road "constructed to accommodate local emergency vehicle access requirements" and that it be "maintained in

a reasonable condition." COGCC Rule 603.b.(14). *Gerrity* instructs that the rule of reasonable accommodation applies "[i]n the absence of, statutes, regulations, or lease provisions to the contrary. . . ." *Gerrity*, 946 P.2d at 926. The Lease grants the right to install a road. Amoco installed its road in a reasonable manner and at a location that was both reasonable and in compliance with the county and COGCC permits. The access road is reasonable and necessary.

**Surface Use**

Amoco requests a declaration that its operations accommodate Thunderhead's surface use. Pursuant to its oil-and-gas lease, and under the authority of the state and county permits issued in this case, Amoco was entitled to use the surface estate of the Property in the current manner. As stated in *Gerrity*, "[h]ow much accommodation is necessary will, of course, vary depending on surface uses and on the alternatives available. . . ." *Gerrity*, 946 P.2d at 927. The evidence established that this is a highly mitigated well. The well and related equipment do not materially interfere with the current use of the surface estate as a pasture. The Texas Supreme Court limits the accommodation doctrine to existing uses, stating:

> "[W]here there is an *existing use* by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the lessee whereby the minerals can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the lessee."

*Getty Oil Co. v. Jones*, 470 S.W.2d 618, 622 (Tex.1971) (emphasis added). This authority is persuasive and not in conflict with *Gerrity*. It is unreasonable to require Amoco to accommodate speculative future surface uses. As Plaintiff states in its trial brief, "[i]t is one thing to have a building permit in hand and the legal right to proceed with construction. It is quite another to have a tentative plan." Thunderhead may not construct the subdivision it asked Amoco to accommodate without overcoming major obstacles (the southern access road, receiving Bayfield final plat approval, and annexation). Further, Amoco mitigated to a reasonable extent potential effects on possible future uses. Amoco reasonably accommodated Thunderhead's requests regarding location of the well within the parameters of applicable regulations and permit conditions. Amoco's use of the surface was reasonable and necessary as measured by the usual, customary, and reasonable practices of the oil-and-gas industry and in light of applicable regulations.

**Well Location**

The as-built and approved location of the subject well reasonably accommodated Thunderhead's request that the well be moved to the north and west from the APD location. Thunderhead's requests for southern locations were not reasonable alternatives. First, Amoco would need a COGCC exception to drill vertically. If the well were drilled vertically, it would drain the gas owned by numerous interest holders in the spacing unit to the south. Waivers from those owners would be required. There is no reason to believe they would be granted.

█ Drilling directionally from a southern site so as to "bottom" within the drilling window also is not a reasonable alternative. As Brian Stepanek testified, directional drilling at a 46–degree angle was not feasible. Given the regulatory and permit limits on Plaintiff's well location, combined with the adjacent land-owners' refusals to waive setback restrictions, Plaintiff's well location is reasonable and necessary. Thunderhead argues that Plaintiff should have at least

requested safety and/or property-line setback variances from the COGCC. A variance request would have been futile because the COGCC would not vary the setbacks without waivers, and the affected nearby property owners and the School District refused to grant waivers.

Amoco has reasonably accommodated Thunderhead. First, it changed its well location in the direction requested by Thunderhead at the on-site meeting. Second, the COGCC permit is laced with conditions requested by Thunderhead to minimize adverse impacts to future development. Third, Amoco assessed several well locations with a view toward minimizing interference with Defendant's planned subdivision. Fourth, Thunderhead's development of the Property into a subdivision is speculative and far from final approval. Under the present circumstances where there is no threat of imminent development, Amoco has reasonably accommodated the present use of the Property.

Accordingly, IT IS ORDERED THAT JUDGMENT ENTER DECLARING THAT:

1) PLAINTIFF is not and was not required to request state and/or county variances for setback and safety regulations;

2) PLAINTIFF has reasonably accommodated DEFENDANT'S present surface use and speculative future surface use;

3) PLAINTIFF may use and maintain its access road as it is built to access Neva Dove Unit A # 2; and

4) PLAINTIFF's sound mitigation issue is moot.

Further, IT IS ORDERED THAT:

5) DEFENDANT'S counter-claim for declaratory judgment is DISMISSED; and

6) PLAINTIFF is awarded its costs.