BELLE FOURCHE PIPELINE COMPA-
NY, a Wyoming corporation,
Appellant (Defendant),

v.

ELMORE LIVESTOCK COMPANY, a Wy-
oming corporation, and Mike Elmore
and Rita Elmore, d/b/a Elmore Live-
stock Company, Appellees (Plaintiffs).

No. 5829.

Supreme Court of Wyoming.

Aug. 30, 1983.

Richard E. Day and Patricia M. Baird of Williams, Porter, Day & Neville, P.C., and Robert Stanley Lowe, Casper, for appellant.

Kim D. Cannon and Rebecca W. Thomson of Burgess & Davis, Sheridan, for appellees.

Before ROONEY, C.J., and RAPER *, THOMAS, ROSE and BROWN, JJ.

RAPER, Justice, Retired.

In this case, the Elmores (appellees) filed suit against Belle Fourche Pipeline Company (appellant) for the damage done to their land and the groundwater beneath it when appellant's high pressure crude oil pipeline ruptured and spilled oil on appellees' land.

---

\* Retired June 13, 1983, but continued to participate in the decision of the court in this case pursuant to order of the court entered June 13, 1983.

After a jury trial, appellees were awarded $40,000 for the damage done to their land. Additionally, appellant was required to pay $57,250 into the court registry to restore the groundwater to its prior condition, to be expended subject to stipulation or order of the court. Appellant questions both the amount of damages awarded for appellees' land and the propriety of appellees' suit to restore the condition of the groundwater. Appellant phrases the issues raised as follows:

"1. Pollution of Ground Water.

"A. Did Appellees have sufficient compensable interest in the ground water to permit an award of damages for costs of cleanup?

"B. Did the trial court have jurisdiction in this action to instruct the jury on awarding damages based upon the cost of restoration of the ground water?

"C. Did the trial court err in permitting testimony concerning cost of restoration which exceeded value of the land and which was remote, uncertain, conjectural and speculative?

"2. Was the award of forty thousand dollars for damages to Appellees' land unsupported by competent evidence with the result that the damages assessed were irrational, speculative and contrary to law?"

We will reverse as to the $57,250 and reverse and remand for new trial as to the $40,000.

On October 8, 1976, a high pressure crude oil pipeline owned and operated by appellant ruptured spilling approximately 300 to 500 barrels of crude oil onto appellees' land. The area covered by the spilled oil amounted to approximately three acres. The oil flowed downhill from the point of the rupture over moderately sloping range land and into a gently sloping alfalfa field. The oil followed a natural drainage way. The size of the oil spill ranged from 20 to 150 feet wide by approximately 6/10ths of a mile long. The oil penetrated the soil from a depth of six inches at the top of the slope to seven feet at the bottom.

Although appellant attempted to clean up the site immediately after the spill, its efforts were neither completely successful nor satisfactory to appellees. Appellant has never contested the fact that it was liable for the damage to appellees' land and that the damage was permanent. The only dispute in that regard is to the amount owed by appellant and how that figure is to be reached. Additional facts regarding that issue will be addressed later in this opinion.

In May 1980, three and one-half years after the spill, appellees obtained the services of a consulting engineering firm to determine what could be done to restore the land within the oil spill site. In the course of their efforts, the consultants took various soil samples and groundwater samples. Their water samples were obtained from a pit dug to a depth of seven feet near the terminus of the oil's travel. The sampling pit cut into a shallow groundwater acquifer. In September 1980, when the water samples were analyzed, analysis revealed that the water samples contained more than acceptable amounts of oil. Later tests on water samples taken from the same location also revealed unacceptably high amounts of oil in the water. The conclusions concerning water quality were reached by using state water quality standards found in the rules and regulations of the Wyoming Department of Environmental Quality (DEQ), Water Quality Division.[1] The water analysis indicating possible groundwater pollution caused by the spill became known to appellees in November 1980 when the consulting firm submitted a report of its findings to them.

In appellees' original complaint, filed in September 1980, no claim for relief was based on pollution of the groundwater. After the consultant's report was submitted to appellees, an amended complaint was filed in September 1981. That amended com-

---

1. Chapter VIII of DEQ's rules and regulations entitled "Quality Standards for Wyoming Groundwater" provided the applicable standards upon which the conclusion was made that the groundwater sampled was polluted.

plaint formed the basis for trial in this case. In it, appellees, in addition to complaining about the damage done to the surface of the land, alleged that appellant had polluted the groundwater beneath the land thereby damaging the land itself.

Since the oil spill, appellees have not suffered any harmful effects from alleged oil pollution of the water upon or underlying their land. Appellees admitted that at trial. In fact prior to late 1980, appellees could not have been affected by polluted underground water since they had yet to seek permits from the state engineer to drill and appropriate the water underlying their land. In August 1980 and in April 1981, appellees sought and were granted permits to drill a total of three irrigation wells within the general area of the spill site. At the time of trial, the three irrigation wells were in the process of being completed. Where water had been produced, no oil pollution was apparent; therefore, no harm resulting from oil pollution had occurred. The water from these wells, at the time of trial, had yet to be put to any beneficial use.

The case was tried before a jury on the issues of (1) the amount of damages appellees were entitled to for injury to their land; (2) whether the oil spill polluted the surface or groundwater; and (3) if the waters were polluted by the oil spill, what damages appellees were entitled to for that pollution. After the presentation of evidence, the jury was instructed on the law as the trial judge visualized it and at appellant's request, made pursuant to Rule 49, W.R.C.P., the jury was required to complete a special verdict form which contained several interrogatories. The jury found that appellees' lands were damaged by the spill and that the amount owed by appellant was the difference in values before and after the spill which amounted to $40,000. The jury further found that the oil spill had polluted the groundwater and that appellant should pay $57,250 to restore it to its prior condition.

**2.** Appellant had at trial made timely motions

Appellant, after entry of judgment, filed a timely motion for new trial or in the alternative for a judgment notwithstanding the verdict, complaining primarily about the assessment of $57,250 to restore the groundwater.[2] After hearing arguments on the motions, the trial court entered an order denying the motions and amending the judgment. The judgment was amended to the extent that the $57,250 awarded for restoration of the water was to be paid into the registry of the court subject to disbursement only upon stipulation of the parties or order of the court. This appeal followed.

I

Since appellees suffered no harmful effects from alleged water pollution, their theory for recovery of damages is based on the mere fact that the underground water is polluted. Appellant argues essentially that any cause of action appellees may have had based on pollution of the underground water underlying their land was improperly brought. We agree.

The groundwater at issue is water of the state as defined in § 35–11–103(c)(vi), W.S.1977. That statute defines waters of the state to mean "all surface and ground water within Wyoming." Section 35–11–301(a)(i), W.S.1977, prohibits, except when authorized by permit, the discharge of pollution into the waters of the state. We have previously held that crude oil entering the waters of the state from a ruptured pipeline is a discharge of pollution prohibited by § 35–11–301(a)(i), supra. *People v. Platte Pipe Line Company,* Wyo., 649 P.2d 208 (1982). We further held in *People v. Platte Pipe Line Company,* supra, that owners of pipelines which discharge oil into waters of the state are liable to the state regardless of fault for damages and the civil penalties set out in § 35–11–901, W.S. 1977, Cum.Supp.1983. Id., 649 P.2d at 214. Therefore, if in fact oil from appellant's ruptured pipeline did enter the groundwater, appellant is strictly liable to the state

for directed verdict on all issues.

for any damages it caused and the civil penalties set out in § 35–11–901, supra.

Section 35–11–901, supra, provides for penalties for the violation of the Wyoming Environmental Quality Act, § 35–11–101 et seq., W.S.1977, of which § 35–11–301, supra, is a part. It provides the means by which the DEQ proceeds against violators of the act after investigations of alleged violations have been conducted pursuant to § 35–11–701, W.S.1977, Cum.Supp.1983.

■ Although § 35–11–901, supra, deals with the state's action against violators of the act, individual citizens are not prevented from seeking redress in the courts for violations or for damages resulting from violations of the act or rules, regulations, etc. promulgated thereunder. Section 35–11–902, W.S.1977, Cum.Supp.1983, provides both for suits by interested citizens acting as private attorneys general and for existing personal claims resulting from violations of the Wyoming Environmental Quality Act; it provides in pertinent part:

"(a) Except as provided in subsection (c) of this section, *any person having an interest which is or may be adversely affected, may commence a civil action on his own behalf to compel compliance with this act* only to the extent that such action could have been brought in federal district court under Section 520 of P.L. 95–87 [30 U.S.C. § 1270], as that law is worded on August 3, 1977:

"(i) Against any governmental entity, for alleged violations of any provisions of this act or of any rule, regulation, order or permit issued pursuant thereto, *or against any other person for alleged violations of any rule, regulation, order or permit issued pursuant to this act;* * * *

* * * * * *

"(c) *No action pursuant to this section may be commenced:*

"(i) *Prior to sixty (60) days after the plaintiff has given notice in writing of the violation and of his intent to commence the civil action to the department and the alleged violator,* except

that such action may be brought immediately after such notification if the violation complained of constitutes an imminent threat to the health or safety of the plaintiff or would immediately affect a legal interest of the plaintiff; or

"(ii) If the department, through the attorney general, has commenced a civil action to require compliance with the provisions of this act, or any rule, regulation, order or permit issued pursuant to this act, but in any such action any person may intervene as a matter of right.

"(d) The state of Wyoming, department of environmental quality, may intervene as a matter of right in any action filed pursuant to this section.

* * * * * *

"(g) Nothing in this act shall in any way limit any existing civil or criminal remedy for any wrongful action arising out of a violation of any provision of this act or any rule, regulation, standard, permit, license, or variance or order adopted hereunder." (Emphasis added.)

That statutory provision would allow a suit such as the one brought by appellees, as interested parties who may be adversely affected, in which no actual personal harm is complained of but merely the violation of the rules and regulations issued pursuant to the Wyoming Environmental Quality Act. However, to do so requires adherence to certain procedural requirements including the 60-day notice requirement found in § 35–11–902(c), supra. Notice to the State and the alleged violator is required prior to the initiation of court proceedings by a private person in the absence of the exceptional circumstances described in § 35–11–902(c), supra. Appellees neither alleged nor proved any such damages as might be recovered under those theories.

■ Appellees' claim and the evidence they produced at trial can only be construed as going to show that appellant polluted the groundwater in the vicinity of the oil spill. Appellees were not appropriators or beneficial users of water they complain was pol-

luted. Appellees failed to show any damages they suffered as a result of the alleged violation of the act which would entitle them to relief under § 35–11–902(g), supra. They had no water right which was harmed since they had yet to apply any of the groundwater to a beneficial use. It is elementary water law that in Wyoming beneficial use is the basis, measure and limit of a water right. Section 41–3–101, W.S.1977, Cum.Supp.1983; *John Meier & Son, Inc. v. Horse Creek Conservation District of Goshen County,* Wyo., 603 P.2d 1283 (1979). See also, *Green River Development Company v. FMC Corporation,* Wyo., 660 P.2d 339 (1983). Water is the property of the state. Section 41–3–101, supra. Rights to underground water are subject to the same preferences as those provided by law for surface waters. Section 41–3–906, W.S.1977.

Although recovery for damages resulting from pollution of the groundwater in violation of the Wyoming Environmental Quality Act could be had under existing remedies such as trespass or nuisance actions, § 35–11–902(g), supra, those damages must be proven. Appellees neither alleged nor proved any such damages.

■ Therefore, since appellees' action can only be construed to have been brought as a private attorney general under § 35–11–902(a)(i), supra, such action was procedurally defective for failure to provide both DEQ and appellant with proper notice required in § 35–11–902(c)(i), supra—the notice required by the statute to allow the State to enter the action if appropriate.[3] That procedural defect requires reversal of that portion of the judgment dealing with restoration of the underground water to its prior condition. In reversing that portion of the judgment, we do not reach the merits of the claim nor the manner in which the amount required for restoration was reached. Accordingly, we must reverse and set aside that portion of the judgment requiring payment of $57,250 to restore the water. The district court had no jurisdiction to enter such a judgment. Only the State of Wyoming may initiate and pursue such remedy.

## II

■ In its second issue, appellant calls into question the competence of appellees' evidence upon which the jury relied in awarding $40,000 for the damage to appellees' land. The law is well settled in Wyoming that the measure of damages for injury to real property where that injury is of a permanent nature—i.e., where it cannot be repaired except at great expense—is the difference between the value of the property immediately before and the value immediately after the injury. *North Central Gas Company v. Bloem,* Wyo., 376 P.2d 382 (1962); *Town Council of Town of Hudson v. Ladd,* 37 Wyo. 419, 263 P. 703 (1928). See also, 2 Land and Water L.Rev. 235 (1967). In several recent, analogous condemnation cases dealing with the measure of damages for easements, this court has again held that before and after values must be used to determine damages to realty. *Energy Transportation Systems, Inc. v. Mackey,* Wyo., 650 P.2d 1152 (1982); *Coronado Oil Company v. Grieves,* Wyo., 642 P.2d 423 (1982). In those decisions, we made it clear that in order to reach damages, the fair market value of the entire parcel immediately before and immediately after the easement is granted must be proven by competent evidence.

■ Here, where appellees complained of the loss in value to their ranch caused by the oil spill, it is only proper to require proof of the fair market values of their entire ranch before and after the spill in order to prove damages. *Frankfort Oil Company v. Abrams,* 159 Colo. 535, 413 P.2d 190 (1966); *Town Council of Town of Hudson v. Ladd,* supra. In determining damages to the entire parcel, consideration may be given to every lawful use the land may be put to. That consideration is not limited to the use the land was being put to at the

---

**3.** Prior to trial in this case, the record indicates that DEQ had issued a cease and desist order pursuant to § 35–11–901, supra, and had begun proceedings against appellant for polluting the groundwater.

time of the injury. *Coronado Oil Company v. Grieves,* supra (citing *Canyon View Ranch v. Basin Electric Power Corporation,* Wyo., 628 P.2d 530 (1981)).

■ Proof of before and after fair market values must be by competent and permissible evidence. *Energy Transportation Systems, Inc. v. Mackey,* supra; *Coronado Oil Company v. Grieves,* supra. In both of those cases, no competent evidence of before and after values was presented by the landowners. In *Energy Transportation Systems, Inc. v. Mackey,* supra, there was no testimony presented by the landowners as to the before and after values of their property. In *Coronado Oil Company v. Grieves,* supra, not only was impermissible testimony as to damages admitted over objection, but the only before and after value figures admitted were shown to be incompetent by opposing counsel. There the trial court erred in refusing to strike that incompetent testimony as requested by opposing counsel.

At the trial of the case now on appeal before us, appellant elected not to challenge the competency of the appellees' expert witness, and no motion was made to strike the expert's testimony. Instead, upon cross-examination, appellant's counsel caused appellees' proof to fail when the appellees' expert witness in his testimony agreed with the position which the appellant had held from the time of the pretrial conference on. At the close of appellees' case in chief, the appellant then moved for a directed verdict on the ground that appellees had failed to sustain their burden of proof and had failed to demonstrate a prima facie case of damages concerning the land. The motion was renewed at the close of all the evidence, and both motions were overruled.

■ In this case the facts created a requirement for a particular result, as a matter of law. The motion for a directed verdict should have been granted. The rule is that the test to determine if a motion for directed verdict should be granted is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached. 9 Wright & Miller, Federal Practice and Procedure: Civil § 2524.

■ This court has more often been confronted with error in the granting of motions for directed verdicts than in denying them—*Vassos v. Roussalis,* Wyo., 658 P.2d 1284 (1983), for example. The trial judge here did follow a preferable practice of letting the case go to the jury and letting some of the questions of law be settled later, rather than undergoing the risk of new trial if the evidence was properly present. It is thoroughly established with some limited exceptions that the sufficiency of the evidence is not reviewable on appeal unless a motion for a directed verdict was made in the trial court. *Curtis v. Center Realty Company,* Wyo., 502 P.2d 365 (1972); *Warner v. Kewanee Machinery & Conveyor Company,* 411 F.2d 1060 (6th Cir.1969). See also, 9 Wright & Miller, Federal Practice and Procedure: § 2536.[4] We therefore have an appeal in which the appellees' evidence may be reviewed to determine if it will support a $40,000 verdict for damage to the land. It will not.

Appellees' ranch is a 7,800-acre unit. Appellees' expert appraiser testified that the highest and best use of the land was division into 40-acre tracts as ranchettes. For this purpose he only used the 1,760 acres of

**4.** A motion for judgment notwithstanding the verdict permitted by Rule 50, W.R.C.P., is not a condition precedent to an appeal from a final judgment. *Simmons v. City of Bluefield,* W.Va., 225 S.E.2d 202 (1975); *Gorsalitz v. Olin Mathieson Chemical Corporation,* 429 F.2d 1033 (5th Cir.1970), on retrial, 456 F.2d 180 (5th Cir.1972), cert. denied, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807, reh. denied, 409 U.S. 899, 93 S.Ct. 108, 34 L.Ed.2d 159 (1972);

*United States v. Mountain State Fabricating Company,* 282 F.2d 263 (4th Cir.1960); *Hansen v. Vidal,* 237 F.2d 453 (10th Cir.1956). The appellant filed such a motion but its thrust was primarily toward the lack of the court's jurisdiction with respect to damage to underground water. In any event, the motion extended the time for appeal before the court entered its amended order and judgment.

the Elmore home ranch. It was his view that the oil spill affected the value of three 40-acre tracts to the point that they would, in his opinion, not be saleable or if saleable be sold last because of decreased desirability. The ranch had never by survey been actually divided into 40-acre tracts, including any network of roads so he estimated a location for the three 40-acre mini-ranchette tracts by using sections and dividing them into quarter-quarter sections (1/16th of 640 acres).

Appellees' appraiser estimated the before value of the 1,760 acres at $1,056,000 with an after value of $996,000 immediately afterwards. In 40-acre tracts, he opined the ranchettes would sell at $600 an acre, average. He based this on comparable sales in the area in which some ranchettes sold for a little less than that amount and others sold for up to $1,000 an acre. The witness allocated $600 an acre for the 44 individual tracts which could be carved out of the 1,760 acres. His value per tract was therefore $24,000.

In his estimate of the value, he arbitrarily took into consideration the contamination of underground water and the presence of the oil spill would reduce the value by $500 per acre or $20,000 for each of the 40-acre tracts, leaving each 40-acre ranchette worth $4,000 or $100 per acre. The witness made no estimate of the land value for any other use.

On cross-examination, it was developed that his appraisal was based upon the property being free and clear of any encumbrances, any liens, "or anything else," including "special or unusual deed conditions or restrictions." It was further discovered that the witness had not checked the public records. He knew, however, that appellees had prior to the oil spill purchased for coal development the Springen Ranch which adjoins the Elmore home ranch.

It was further brought out on cross-examination that had the witness checked the records, he would have found that at the time of the oil spill there was a coal lease between appellees and Old Ben Coal Company, admitted in evidence at a pretrial proceeding as Defendant's Exhibit C–2. The lease terms gave to the Old Ben Coal Company an exclusive right to the use of the surface of all of Section 28 upon which the oil spill was located. The witness was not aware of the lease terms until the trial at which time he read the lease and agreed that was true. The pertinent lease terms allowed appellees use of the surface as long as not inconsistent with the lease.[5]

On cross-examination, appellees' expert valuation witness, as questioned, answered:

"A Oh, I have no doubt in my mind that I could have found a willing buyer to buy that property for $600 an acre, subject to that lease.

"Q With the right of Old Ben Coal Company to come in and do whatever they wanted with the surface of that property?

"A Right.

"Q At any time?

"A Now, that's—again, that's taking in a whole different market that we're talking about there.

"Q You're talking about for ranchettes.

---

5. The terms of paragraph 1.5, Article I, of the lease are:

"Subject to proof of title as provided in paragraphs 1.2, 1.3, and 1.4 hereof, Lessor, in consideration of the payment of the royalties hereinafter provided, and of the agreements of Lessee herein contained, hereby grants, leases and assigns exclusively unto Lessee the lands described in Exhibit 'A', together with all contracts and leases affecting said lands for the purpose of investigating, exploring, drilling, extracting, mining through augering, stripping, or other methods, operating, removing, preparing, marketing and transporting all of the economically mineable coal lying in, on or under the coal lands and further grants, leases and lets *exclusively* unto Lessee the surface acreage for any purposes or uses consistent with the mining of coal from the coal lands, including not by way of limitation, location of overburden, machinery, buildings, tipples, plants, roads, tracks, power stations, power lines, equipment, facilities, structures, and supplies, to the end that Lessee shall, as to the coal lands and surface acreage have and hold all such lands with all such appurtenances, hereditaments, rights and easements, as may be necessary to the implementation of this Agreement." (Emphasis added.)

"A Okay. Yeah, but you asked the question could I find a willing buyer to buy that property subject to that and, yes, I could.

"Q Could you find a willing buyer under your highest and best use to purchase a ranchette—

"A No.

"Q —subject to the terms of that lease?

"A No, I could not."

With that last answer, appellees' whole valuation, based solely on a highest and best use for ranchettes, evaporated.

 This left the appellees with no other evidence other than cost of restoration of the less than three acres of land which, according to appellees' offer of proof, ran over $150,000. The trial judge did properly reject that evidence on objection by appellant. The appellees were stopped in that regard by the established rule that the cost of restoration cannot exceed the fair market value of the land. *Town Council of Town of Hudson v. Ladd,* supra. The ultimate question is the depreciation in the fair market value. *Wheatland Irrigation District v. McGuire,* Wyo., 562 P.2d 287 (1977). Cost of restoration is not based on fair market value. No instruction was given to the jury to find damage to the ranch of appellees other than upon a basis of difference in fair market values before and after. The appellant provided the only valid evidence of the depreciated market value in the sum of $2,000. Cost of restoration as a basis of damages could not therefore exceed that amount.

 Appellant's expert appraiser witness in his testimony disclosed a thorough investigation of comparable sales and the highest and best use of such land, following accepted appraisal practices. His opinion was that the total value of the ranch—7,800 acres—was not affected by the oil spill. He compared the oil spill to other problems found on his comparables: for example, power lines, pipelines, closed paved roads, etc. He pointed out that the

three acres damaged constituted less than 1/20th of one percent of the total ranch spread,[6] so it could have little effect. However, he found that the productivity of the three acres was lost to raising hay, so he capitalized it on the basis of production of one ton of hay per year at $100. Capitalization is a method of appraisal which can be used when comparable values do not show a depreciation in value but there is known damage. Appellees are entitled to something.

In the face of the presence of the Old Ben Coal lease, appellant's expert appraiser found the highest and best use to be sale of surface over minerals for coal mining, with an interim use of farming or ranching, which was actually taking place. He found the value of the ranch immediately before the oil spill to be $4,935,000 and the value of the ranch immediately after the oil spill to be $4,933,000 or a difference of $2,000, attributable to loss of hay production on the three acres.

We do not examine the credibility of appellant's witness. We only hold that his testimony was the only legally acceptable testimony of land values. That is why we must remand for a new trial and do not direct entry of judgment in the sum of $2,000.

Since there must be a new trial on the question of damages to the land by reason of the spill, there are other errors of such a serious nature that they may constitute plain error, though we do not decide the case on that basis. We can find no objection by counsel for appellant to some errors we consider of a fundamental nature which may have confused the jury into reaching the erroneous verdict of $40,000 as the difference between the immediately before and immediately after fair market values.

 Ordinarily, the supreme court refrains from inquiring into questions not raised by the parties, *Pritchard v. State, Division of Vocational Rehabilitation, Department of Health and Social Services,*

---

**6.** The 1,760 acres in the Elmore home ranch plus 6,066 acres in the Springen spread total 7,826 acres, rounded to 7,800 acres. The three acres amounted to 1/2600th of the ranch.

Wyo., 540 P.2d 523 (1975). However, on appeal in which the judgment is reversed, it is also proper for this court to decide incidental questions which are bound to arise again in the case at a new trial. *Rocky Mountain Oil and Gas Association v. State,* Wyo., 645 P.2d 1163 (1982); *Madison v. Marlatt,* Wyo., 619 P.2d 708 (1980); *McGuire v. McGuire,* Wyo., 608 P.2d 1278 (1980); *Chicago & N.W. Ry. Co. v. City of Riverton,* 70 Wyo. 119, 247 P.2d 660 (1952). As said in *Chicago & N.W. Ry. Co. v. City of Riverton,* supra, it is this court's duty to do so.

From the time of the oil spill until suit was filed by appellees, a period of one month less than the four-year statute of limitations, § 1–3–105(a)(iv), W.S.1977,[7] had elapsed. The case was not tried until six years after the oil spill. After the trial started and the appellees had produced evidence gathered shortly before trial and caught appellant by surprise, the trial was continued for two weeks to afford appellant an opportunity to investigate the matter. The expert witness of appellees on valuations was not employed until a month before trial. The trial judge was justifiably provoked by these delays and such last minute trial preparations. What this delay led to was an attempt to introduce into evidence material improper for the determination of damages in this case and disposition of the case impeded.

The appellees argued but were not allowed to present evidence of enhanced damages because of not having an earlier award which could have been earning interest or otherwise been productive through capital investment.[8] Evidence was produced which was the result of occurrences taking place long after the spill such as the opinion of Elmore that there was no coal under the land because of some exploration holes dug which indicated to him that the land was in a clinker area caused by the coal burning out and evidence that the Old Ben Coal lease had expired. At the same time, appellant was not permitted to introduce into evidence a new coal lease—the so-called Delzer lease—entered into by appellees. The appellees got into evidence the fact that subsequent to the oil spills, water well permits had been obtained, though the water of the wells had never been put to beneficial use.

The foregoing is only set out as introductory to the proposition that the court's instruction for determination of damages was not correct. Instruction 4, in part, follows:

" * * * The measure of damage you must use for the land is the fair market value of the damaged lands before the spills, less the fair market value of those lands after the spills. You will determine the amount of land damaged by the spills."

The measure of damage is not "the fair market value of the damaged lands." There were only three acres damaged. The measure of damage is one that goes to the entire ranch of appellees, owned at the time of the spill. The damage is the difference in value of the whole ranch immediately prior to the damage and the value of the whole ranch immediately after the damage. *Town Council of Town of Hudson v. Ladd,* supra. The determination must be the dif-

7. Section 1–3–105(a)(iv), W.S.1977, provides:
"(a) Civil actions other than for the recovery of real property can only be brought within the following periods after the cause of action accrues:
 * * * * * *
"(iv) Within four (4) years, an action for:
"(A) Trespass upon real property;
"(B) The recovery of personal property or for taking, detaining or injuring personal property;
"(C) An injury to the rights of the plaintiff, not arising on contract and not herein enumerated; and
"(D) For relief on the ground of fraud; * *"

8. Appellees' claim was for unliquidated damages so would draw interest only from the date of the judgment. Section 1–16–102(a), W.S. 1977. Prejudgment interest is recoverable on liquidated but not unliquidated claims. A liquidated claim is one readily computable by simple mathematical computation. *Zitterkopf v. Roussalis,* Wyo., 546 P.2d 436 (1976). See also, *Rissler & McMurry Company v. Atlantic Richfield Company,* Wyo., 559 P.2d 25 (1977). The damages awarded here require more than simple computation.

ference in value *immediately* before and value *immediately* after the occurrence. *Town Council of Town of Hudson v. Ladd,* supra.

■■■ While the amount of land actually damaged by the spills is an important fact, there is no need for a jury to make that finding because whether it was three or ten or whatever acres, the damage must be related to the whole ranch as an operating unit. This court has clearly enunciated that principle in the analogous situation of land condemnation. *Energy Transportation Systems, Inc. v. Mackey,* supra; *Coronado Oil Company v. Grieves,* supra. The strange part of it is that both parties understood that the measure was the damage to the whole ranch except that appellees' appraiser related the damage only to the 1,760 acres of the Elmore home ranch whereas appellant's appraiser properly related the damage to the whole ranch consisting of the Elmore home ranch and the adjoining Springen Ranch acquired by appellees prior to the oil spill—7,800 acres. The appellant understood the *immediately* before and *immediately* after requirement because its counsel filed a motion in limine granted by the trial judge barring any evidence, oral or written, from "plaintiffs' appraisers, unless such appraisals are for the period immediately before and immediately after the date of the oil spill, October 8, 1976."

The foregoing leads us into the special verdict form. We cannot tell from the record who submitted it—the appellant or the court. The appellant submitted a form of verdict but we find it was not attached to the written offer. Perhaps it was detached and was the one used or it was detached by the court, modified by interlineation and retyped.[9] The pertinent part of the verdict submitted and signed by the jury foreman is:

"SPECIAL VERDICT

"1) Did plaintiffs suffer damage to their lands as a result of the oil spills?

Yes __X__ No ____

If yes, answer 2 – 5. If no, skip to 6.

"2) How much land was damaged by the spills?

A. __80__ acres

"3) What was the fair market value of the damaged lands before the spills?

A. $ 48,000.00

"4) What was the fair market value of the damaged lands after the spills?

A. $ 8,000.00

"5) What is the difference between 3 and 4?

A. $ 40,000.00

"6) Was the ground water or surface water in the area of Section 28 contaminated?

Yes __X__ No ____

If yes, answer 7. If no, sign the verdict.

"7) Was the water contamination caused by the oil spills?

Yes __X__ No ____

If yes, answer 8 and 9. If no, sign the verdict.

"8) What sum of money has been or reasonably will be expended in restoring contaminated water to its condition prior to the spills?

A. $ 57,250.00

"9) Apart from the cost of restoration of contaminated water, were plaintiffs damaged because of water contamination?

Yes ____ No __X__

If yes, how much?

A. $_____ "

Appellees' counsel at least in part understood the verdict form was improper and objected:

" * * * Your Honor, I'd like to enter an objection to the special verdict form, calling the record's attention particularly to paragraphs three and four. We would ask that the phrase 'damaged lands' be changed to 'the property, plaintiffs' property.' We feel that this is in accord with Wyoming law. It is in accord with the testimony that has been offered, that the damage to the property—damage to the entire ranch unit. It takes into account the severance damages to other lands, and this instruction improperly calls the jury's attention only to certain specific damaged lands."

refused, the copy to be annotated for source and remain in place in the file as part of the offer.

9. We would like to suggest that when forms of instruction and verdict are submitted that they be in duplicate, the original for use or marked

Appellees were correct. Appellant's counsel sat quiet as to that objection but did object to those parts relating to contamination of the underground water and the cost of cleaning it up.

Even though the appellees' objection was well taken, appellees' expert valuation testimony was that three 40-acre tracts were damaged. Appellees' witness did not testify as to the whole ranch but only 1,760 acres of a 7,800-acre spread. The jury must have been thoroughly confused. The verdict, however, indicates that it must have decided only two 40-acre imaginary potential ranchettes were affected. Question 2 was, from the evidence, capable of one of four answers: three acres, 120 or 80 acres, 1,760 acres or 7,800 acres. Questions 3 and 4 were not proper in that they not only created confusion but did not go to immediately before and immediately after valuations of the whole ranch unit.

■ There are reasons for fixing a time for valuation. The value of real estate is by no means constant and in order to intelligently assess damages, a point in time must be fixed at which the valuation takes place and it is the value as of that time the owner is entitled to receive even if values rise or fall before he eventually receives his money. It would be unreasonable to speculate on what could be done to the land to make it more valuable and then seek evidence on what it might be worth. To do so would lead to speculation and conjecture that would convert a valuation trial into a guessing contest.

■ Theoretically in this case, since the oil spill occurred on October 8, 1976, the land would be valued the moment before the oil spill occurred and then valued the moment after the oil spill ended. However, appraisal is not an exact science so in seeking comparable sales to find value, sales may and probably were not taking place at that precise time, but they should be as close in time as reasonably possible. In any event, changes in the condition of the property taking place after October 8, 1976, cannot affect the amount of compensation to be paid.

Finally, it was brought out in the direct examination of appellant's appraiser and cross-examination by appellees that land bought for potential development of ranchettes has a value of less than land actually developed by dividing into ranchettes and being sold as ranchettes. Appellees' land had no roads to the potential acreages. Appellees' witness based his appraisal on land already developed for ranchettes whereas the land of the appellees was only raw land. On redirect, it was brought out that there must be roads built at great expense so that ranchettes have access. Salesmen must be paid commissions to sell the ranchettes. There is the expense of surveys, fixing values for each tract, promoting their sale, etc.

■ The raw land in question may not be valued as though already cut up into ranchettes, as was done by appellees' appraiser, even if not subject to an exclusive coal lease whereby the surface may be taken over at will by a mining operation at any place, dug into, covered with over burden, used for mining operations by building construction, tipples, machinery parking, roads and every other use related to mining coal.

■ 4 Nichols on Eminent Domain, § 12.3142[1][a] (Third Edition 1981), explains imaginary subdividing, a much abused concept:

"In some cases, however, condemnees have attempted to go so far as to show the number of lots into which a tract is divisible, estimate sales prices per lot and sales prices of comparable sales in the vicinity. In such cases, however, the courts have uniformly adopted the approach that raw land as such, with little or no improvements or preparation for subdivision may not be valued as if the land were in fact a subdivision. Thus the 'lot method' approach to valuation may not be used. The measure of compensation is not the aggregate of the prices of the lots into which the tract could be best divided, since the expense of clearing off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, holding it and pay-

ing taxes and interest until all the lots are disposed of cannot be ignored, and is too uncertain and conjectural to be computed. In any event, if evidence is offered as to developed value consideration must be given to the cost of developing that value. For example, a landowner's preliminary planning and development expense has been held to be a proper element in determining the value of land taken.

"The accepted rule for the evaluation of such land, therefore, is that the land will be considered in its present condition as a whole, with consideration given to any increment or enhancement in value due to the property's present adaptability to subdivision development." (Footnotes omitted.)

While the supreme court is reluctant to set aside a jury verdict and a trial court judgment, that reluctance does not prevent such action if we find no evidence to support the verdict or judgment. *Plains Tire and Battery Company v. Plains A to Z Tire Co., Inc.,* Wyo., 622 P.2d 917 (1981). We do not upset a judgment unless clearly erroneous or contrary to the great weight of evidence. If obviously erroneous and against the evidence, a judgment cannot stand. *Kvenild v. Taylor,* Wyo., 594 P.2d 972 (1979).

The judgment for $57,250 to be held in the registry of the court for disbursement by stipulation or order of the district court is reversed and vacated. The judgment for $40,000 is reversed and remanded for a new trial consistent with the law enunciated in this opinion.

BROWN, Justice, concurring in part and dissenting in part.

I concur in Part I of the majority opinion; I dissent from Part II.

I agree with the majority's decision to reverse the award of $57,250 to appellees in order to restore the groundwater to its condition before the oil spill. Section 35–11–902(a), W.S.1977, Cum.Supp.1982, authorizes "any person having an interest which is or may be adversely affected" to initiate an action in order to force compliance with the Wyoming Environmental Quality Act, § 35–11–101 et seq., W.S.1977. Section 35–11–902(c), W.S.1977, Cum.Supp.1982, requires a party suing under the act to give 60 days' written notice to the Department of Environmental Quality, as well as the alleged violator, before commencing the suit.

Here, appellees had not perfected any right to appropriate the groundwater affected by the oil spill. Accordingly, they were not persons having "an interest adversely affected" by the oil spill. As a result, they did not come within the scope of § 35–11–902(a), supra, and could not institute an action under that subsection.[1] I see no need to address appellees' failure to comply with the notice provisions of § 35–11–902(c), supra, since it only amounts to dicta in light of the failure to satisfy subsection (a).

I would further note that § 35–11–902(g), W.S.1977, Cum.Supp.1982, which provides that the act in no way limits any previously existing cause of action, is not involved here. Again, appellees had no interest in the groundwater at the time of the spill. Accordingly, any damage to the water could not have created a cause of action in their behalf.

Where I differ is with the majority's decision to reverse the judgment as to the $40,000 awarded in compensation for damage to the land. The issue on appeal concerns the sufficiency of the evidence to support the $40,000 award made by the jury. Though I do understand the majority's surprise at

---

[1]. I am satisfied that the attorney general, as the representative for the people of the State of Wyoming, is the proper party to maintain this action. This is particularly so in light of the unusual order entered by the district court requiring the $57,250 to be paid into the registry of the court, so that the court could ensure the

money actually was spent on the clean-up of the groundwater. It makes so much more sense for the money to be paid to the State, and for the State, through the Department of Environmental Quality, to administer the funds, than for the district court to be concerned with such matters.

such a large award for three acres in rural Campbell County, I believe the basis upon which it reverses sets bad precedent for the future. This court should be more concerned about the precedent it sets than the result in a particular case.

Here, the majority finds insufficient evidence to support the verdict only after determining that the opinion of appellees' expert was incompetent. This conclusion is reached because the expert on cross-examination said at one point he could not find a buyer for a ranchette subject to the terms of an existing lease. First, I would note that during the exchange in the transcript the expert also said he could find a buyer. The transcript is very confusing there, and it is hard to know what the witness meant to say when all we have is the cold transcript. Besides, where conflicts exist in testimony this court must resolve those conflicts in favor of the prevailing party. *Farella v. Rumney,* Wyo., 649 P.2d 185 (1982). The majority here ignores that maxim.

Second, no objection was made at any time to the expert's testimony. On appeal, appellant has challenged the competency of the evidence, but I believe it is too late to make such an attack. In *Coronado Oil Company v. Grieves,* Wyo., 642 P.2d 423 (1982), we reversed because of the admission of incompetent expert testimony; but there the majority opinion noted that the appellant had "vigorously objected throughout the trial to such testimony." 642 P.2d at 438. Here, that simply is not the case.

By its failure to object to the competency of the testimony, the appellant waived its claim of error in that regard. The reason for this rule is to require the parties to give the trial judge a chance to remove the error at trial and to avoid protracted litigation. By its decision the majority is undermining that policy. The door is now open to all future litigants who fail to timely object to expert testimony to raise a sufficiency-of-the-evidence issue challenging the competency of experts. This court in the future will be deluged by such claims, not only in civil cases, but criminal cases as well. I am certain that the court will not be sympathetic to those future litigants unless it is dissatisfied with the jury verdict and searching for a way to reverse.

I believe that since there was no objection to the competency of the expert's testimony, the disclosures on cross-examination must be held as going only to the weight to be given the testimony. The expert's opinion concerning the before and after values was given credence by the jurors who awarded damages in the amount he prescribed. In these circumstances we must find sufficient evidence was present to support the jury's verdict.

Finally, I wish to take issue with the majority's assertion that "there are other errors of such a serious nature that they may constitute plain error." The doctrine of plain error encompasses those errors which are obvious, and which, if uncorrected, would be an affront to the integrity and reputation of the judicial proceedings and result in a miscarriage of justice. *In the Matter of C.L.T.,* Alaska, 597 P.2d 518 (1979); and *City of Nome v. Ailak,* Alaska, 570 P.2d 162 (1977).

Where no objection is made at the time error occurred, a new trial may be ordered only if that error arises to the level of plain or fundamental error. To constitute such error, it must possess a clear capacity to bring about an unjust result which goes to the very heart of a party's case. *United Farm Bureau Family Life Insurance Company v. Fultz,* 176 Ind.App. 217, 375 N.E.2d 601 (1978); and *Croy v. Bacon Transport Company,* Okl., 604 P.2d 136 (1979).

The plain error doctrine error is almost exclusively a criminal concept and is used sparingly in civil cases. *Croy v. Bacon Transport Company,* supra. Plain error and harmless error are defined in Rule 49(b), Wyoming Rules of Criminal Procedure: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Rule 7.05, Wyoming Rules of Appellate Procedure, using Rule 49(b), W.R. Cr.P., as the source also defines plain error in an identical fashion. Rule 61, Wyoming Rules of Civil Procedure, defines harmless

error for civil cases; however, the rule does not address plain error. In fact, plain error is mentioned nowhere in the Rules of Civil Procedure.

This difference is also found between the Federal Rules of Criminal Procedure and the Federal Rules of Civil Procedure, and it was noted in Wright and Miller, Federal Practice and Procedure: Civil § 2883 (1973). There it was observed that, despite the omission from the civil rules, plain error was occasionally held available in civil cases. However, the indication was that the standard for plain error in civil cases is much more stringent than in criminal cases.

Generally, plain error has not been applied in civil matters. However, the failure of subject matter jurisdiction receives plain error treatment in that no objection is necessary to preserve it. Also, the deprivation of property without due process of law may on occasion be treated as plain error; but, generally it must be an extreme case.

In the present case, the trial court clearly had subject matter jurisdiction. Further, no obvious violations of appellant's constitutional nor statutory rights occurred. Under the most liberal view of the plain error doctrine I cannot see its applicability to the case here.

I do not believe it is proper for this court to address "incidental questions which are found [likely] to arise again in the case at a new trial" when no one has raised the "questions" in the first place. I believe the majority, when it addresses those "incidental questions," is subverting the most basic appellate rules against giving advisory opinions. I cannot agree with such a practice.

For these reasons I would have affirmed in part and reversed in part and only addressed the issues actually raised by the parties.